794 A.2d 219

LINDA MCRAE, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. ST. MICHAEL'S MEDICAL CENTER, NURSES AND STAFF PERSONNEL, AND ALAN A. KASS, D.P.M., (FIRST NAME UNKNOWN) PARKA, M.D., AND (FIRST NAME UNKNOWN) GONDA, M.D., INDIVIDUALLY, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS, AND THOMAS VITALE, D.P.M., DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 20, 2002—Decided April 8, 2002.

586

Before Judges BAIME, NEWMAN and AXELRAD.

*John L. Shanahan* argued the cause for appellant/cross-respondent (*Hein, Smith, Berezin, Maloof & Jacobs,* attorneys; *Mr. Shanahan,* of counsel and on the brief).

*Rubin M. Sinins* argued the cause for respondent/cross-appellant (*Ashley & Charles,* attorneys; *Thomas R. Ashley and Mr. Sinins,* on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

In this medical malpractice case, the podiatric surgeon, Dr. Thomas Vitale, appeals from the trial court's denial of his motion for a new trial and denial of his motion for remittitur of the jury award for future lost wages.[1] He also seeks a remand for an amended form of judgment limiting the date from which pre-judgment interest must be calculated in accordance with a prior order. Plaintiff, Linda McRae, in a cross-appeal, argues that the trial court's remittitur of the award for past lost wages and for pain and suffering constituted an abuse of discretion.

We affirm in part, reverse in part, and remand on the issue of pre-judgment interest. The judge's opinion supports her order of remittitur of the jury's award of past wage loss and denial of remittitur of the award of future loss of income. It does not, however, support her order of remittitur of the jury's non-economic damages award.

On March 14, 1993, plaintiff was seriously injured when she slipped on ice and snow while working as a security guard at the Newark Housing Authority. She was transported to St. Michael's emergency room and diagnosed with a "significantly displaced tibia (shinbone) fibula (calf bone) fracture" of her right leg. This type of fracture is severe and problematic because of the lack of circulation in that area, which may hinder bone healing or result in loss of a limb. Knowing this, Dr. Parker, the resident on duty, attempted a closed reduction of plaintiff's leg, which procedure was unsuccessful.

Plaintiff required surgery. St. Michael's on-call orthopedist did not respond. Defendant, a licensed podiatrist, went to the hospital and diagnosed plaintiff with a comminuted fracture of the tibia and fibula. The fracture was spiral in nature and traveled completely down and adjacent to the articular surface of the ankle.

---

[1] Defendant, St. Michael's Medical Center ("St.Michael's"), withdrew its appeal seeking remittitur of the jury's award of future lost wages after settling the case with plaintiff.

According to defendant, the bones "exploded from within," similar to the way a plate shatters when it is dropped on a hard-surface floor. Defendant planned to perform an open reduction and external fixation. To do so, he required a large and small fragment set consisting of an internal plate and external fixation device. Defendant testified that he inquired of the operating room staff whether the proper medical hardware was available, and someone told him it was.

Defendant started the surgery without having personally verified the reliability of the medical hardware. Plaintiff was placed under anesthesia. Defendant isolated the area of the leg for surgery, made an incision for the operation, and realigned the fractured bone using pins, clamps and manual manipulation. He then applied a plate as an internal fixation device to add stability to the fracture. The next step was to apply and position the external fixator. However, the external fixator supplied by the staff was too large, and St. Michael's did not have another complete external fixator set available.

Defendant's plans changed in the midst of the operation. He believed that stabilization of the leg was critical, so he continued with the surgery using a "pin and plaster" technique. Since the pins were in place, he used the cast as a rudimentary external fixator and finished the surgery. Plaintiff remained hospitalized from March 14, 1993 through March 31, 1993.

Plaintiff continued to treat with defendant. A subsequent x-ray examination of plaintiff revealed that the plates had shifted since the operation. Defendant decided to perform another open reduction to achieve more compression in the area, and elected not to use an external fixator. Instead, he performed the open reduction with a larger internal fixation plate. Plaintiff was hospitalized from April 20, 1993 through May 4, 1993.

Defendant continued to treat plaintiff at least four times a month. During these treatments he advised her that there was angulation of the fracture. Defendant instituted in-home physical therapy for plaintiff and adopted a wait-and-see plan to determine

whether further procedures were required to correct the alignment. Plaintiff underwent physical therapy from April to September 1993.

At the direction of her worker's compensation carrier, plaintiff consulted with Dr. Anthony E. Stefanelli, an orthopedic surgeon. On September 28, 1993, Dr. Stefanelli examined plaintiff and took x-rays of her leg. He determined plaintiff had a malunion of the fractured tibia and fibula. He explained: "[T]he bones didn't join together the way they were supposed to. They were angulated and were not [in] . . . good anatomical alignment."

Plaintiff related Dr. Stefanelli's opinion to defendant, but continued to see Dr. Vitale because she trusted him. She treated with him until the later part of January 1994, when through her worker's compensation carrier, she was referred to an orthopedic surgeon, Dr. William Oppenheim.

Dr. Oppenheim examined plaintiff on March 8, 1994, and determined that there was "marked varus alignment," i.e., an inward turning of the bones. He also observed a one centimeter discrepancy in plaintiff's limb length. Plaintiff would undergo three surgeries with Dr. Oppenheim and various other procedures to correct plaintiff's angulation and discrepant limb length.

Plaintiff underwent her first surgery with Dr. Oppenheim on March 30, 1994. Dr. Oppenheim removed the medical hardware from plaintiff's leg, performed a fibula osteotomy, a tibial corticotomy, and applied an Ilizarov external fixator to the right leg. The Ilizarov external fixator provides a doctor with control of the bone fragments so that the doctor can change the angulation by rotating the lower leg through the use of different hinges. Plaintiff was hospitalized from March 30, 1994 until April 7, 1994 for this surgery.

On May 16, 1994, Dr. Oppenheim performed further surgery to remove the angular correction hinges and replaced them with derotational hinges. On June 9, 1994, he replaced those hinges with a lengthening system known as "clickers."

On June 24, 1994, plaintiff fell and fractured her left leg when her crutch broke. She underwent surgery at the emergency room of St. Barnabas Medical Center and was hospitalized from June 24, 1994 until July 12, 1994. During that time, Dr. Oppenheim also made corrections to the Ilizarov device. Plaintiff required a wheelchair because her legs were not capable of bearing weight.

Dr. Oppenheim saw plaintiff on a monthly basis between July and October 1994. During that period, plaintiff progressed from being confined to a nursing home to walking with a quad cane. He instructed plaintiff to continue with physical therapy. On October 17, 1994, plaintiff was hospitalized for removal of the Ilizarov device.

Dr. Oppenheim continued to see plaintiff on a monthly basis from November 1994 through February 1995, and in April and May 1995. By November 1994, Dr. Oppenheim had improved plaintiff's rotation and corrected her leg length. At the December 1994 examination, plaintiff could walk, bearing full weight on her leg, and in February 1995, Dr. Oppenheim applied a tibial air cast. By May 25, 1995, plaintiff was walking without the use of any assistive device.

Dr. Oppenheim examined plaintiff on June 6, 1996 and July 7, 1998. During the July 1998 examination, Dr. Oppenheim discussed removal of the plate that remained in her leg since the 1994 surgery. On August 17, 1998, plaintiff was admitted to St. Barnabas, and Dr. Oppenheim surgically removed the plate and applied a cast. Plaintiff was discharged on August 20, 1998, and within a week was walking full weight-bearing on both sides with a walker or crutches. Dr. Oppenheim instructed plaintiff to attend physical therapy.

Plaintiff continued to see Dr. Oppenheim on a monthly basis. On September 25, 1998, she advised Dr. Oppenheim that the pain she had experienced in her ankle resolved with the removal of the plate. By October 23, 1998, plaintiff was no longer using a cane or crutch and had driven to her appointment. Plaintiff concluded her treatment with Dr. Oppenheim on December 11, 1998.

At the trial, the parties did not dispute the nature of plaintiff's injury or the necessity of the initial surgery. Instead, the dispute concerned plaintiff's claims that defendant was negligent in that (1) he failed to verify that the proper medical hardware was available for the operation; (2) he continued the surgery after discovering that the medical hardware was not available; and (2) he failed to use an external fixation device during the second surgery.

As to the first claim, plaintiff's expert, Dr. Stefanelli, testified that a doctor is responsible to examine medical hardware prior to beginning an operation. St. Michael's expert in the field of orthopedic surgery, Dr. Howard Blank, concurred. Aurora Sabala, a registered nurse, testified as a fact witness on behalf of St. Michael's that "it would be normal" for the doctor to visually confirm that the equipment was available.

Defendant proffered the testimony of Dr. John Martin Buckholz and Dr. Parker. Dr. Buckholz, an expert in the field of podiatric surgery, testified that doctors rely on the operating room staff to ensure that the correct medical hardware is available for an operation. Dr. Parker, testifying as a fact witness, stated that at St. Michael's the doctors would rely upon the trained emergency room staff for the required surgical equipment.

Plaintiff presented the expert testimony of two orthopedic surgeons, Dr. Stefanelli and Dr. Robert Dunn, in support of her claim concerning the continuation of the initial surgery without the appropriate medical hardware. Dr. Stefanelli opined that defendant deviated from acceptable medical standards by plating both the fibula and the tibia and using an inadequate immobilization. He further testified that if defendant used the proper fixation device during the first operation, plaintiff would not have required the further surgeries.

Dr. Dunn physically examined plaintiff on four separate occasions and reviewed her medical records. He opined that defendant violated medical standards in the first operation with the use of an inadequate plate and by proceeding with the operation

without the proper equipment. Dr. Dunn testified that the plate used by defendant in the initial surgery was insufficient to stabilize plaintiff's fracture. Dr. Dunn also testified that the insufficiency of that plate necessitated the second operation.

Defendant offered the testimony of Dr. Buckholz that defendant's use of the smaller plate in the initial surgery was preferred because it would not hinder circulation. Dr. Buckholz opined that defendant's "best alternative" was to place the pins in a cast. He acknowledged, however, that pin and plaster is the most unstable technique of resetting a bone, and that he had "never" seen that technique used "anywhere in the United States."

Dr. Blank testified on behalf of St. Michael's that defendant exceeded his hospital privileges when he operated on plaintiff. According to hospital records, defendant was not privileged to do external fixation surgeries at St. Michael's.

In support of her claim that the second surgery necessitated the subsequent surgeries performed by Dr. Oppenheim, plaintiff again offered the testimony of Dr. Stefanelli and Dr. Dunn. Dr. Stefanelli opined that defendant improperly performed the second operation and that the operation performed by Dr. Oppenheim was necessitated by defendant's negligence. He stated: "The only reason it had to be done [was] . . . because the bone had healed in the wrong position. Had it healed perfectly normal, [she] . . . wouldn't have needed an operation, she wouldn't have had to have it broken again." Dr. Dunn agreed that, without negligence in this case, the subsequent operation would not have been necessary.

Dr. Buckholz, defendant's witness, testified that defendant did not deviate from acceptable medical standards. While he recognized that the angular deformity and malunion resulted after defendant's second operation, he opined that it was due to the nature of the injury, and not the operation. This statement was inconsistent with Dr. Buckholz's deposition testimony. Dr. Buckholz also testified that the second operation could have been necessitated by the plaintiff's fracture and the use of a cast.

Plaintiff offered the expert testimony of Dr. Oppenheim, Dr. Stefanelli, and Dr. Dunn as to the extent and permanency of her physical injuries. According to Dr. Oppenheim, plaintiff had permanent scarring and loss of range of motion with a fullness about the soft tissue in the region of the surgeries and would experience pain and discomfort in the future as a result of those permanent conditions. Dr. Dunn and Dr. Stefanelli agreed with Dr. Oppenheim and concluded that the permanent losses were caused by the negligence of defendant. Dr. Oppenheim and Dr. Dunn also agreed that plaintiff would require a sedentary type of job because she could no longer stand or walk for long periods of time. Defendant disagreed and maintained that the pain, discomfort and work restrictions plaintiff experienced were inherent to her injury as was the loss of alignment and malunion.

Plaintiff also testified as to her pain and suffering and how it affected her personal and working life. At the time of the accident, plaintiff, then thirty-six years old, worked as a security guard and part-time bartender, earning an aggregate net annual salary of $26,000. Her education did not extend beyond high school. Prior to her security job, plaintiff worked sporadically from 1978 onward in retail sales and fast food establishments. After the accident, plaintiff worked again in retail sales for a few weeks in 1998 and 1999. Plaintiff claimed she did not have a car and, therefore, her job search was hindered. She also claimed that employment training classes were full and she did not want a receptionist's job. In May 2000, plaintiff began working part-time as a hostess in a Newark restaurant earning $8.50 per hour, and netting $439 biweekly. Plaintiff testified at trial that she was then forty-three years of age and planned to work until she was sixty-five years old.

The judge gave the standard jury charges for loss of income, including calculating plaintiff's past and future lost earnings based on her net income after taxes and her obligation to make "reasonable efforts and ordinary care" to minimize the damages due to

loss of earnings.  As to future loss of income she charged the jury as follows:

> In deciding what plaintiff's future losses are, understand that the law does not require of you mathematical exactness.  Rather, you must use sound judgment based on reasonable probability.  Once you have decided how much money plaintiff will lose in the future, you must then consider the effects of the inflation and interest.
>
> . . . .
>
> [Y]ou must make an adjustment for having the money available now, even though the loss will not be experienced until the future.  This adjustment is known as discounting and what discounting does is give you the value of the money that you get now instead of getting it at some future time.

After deliberating, the jurors unanimously found in favor of plaintiff and apportioned liability as follows: twenty-five percent against plaintiff's pre-existing condition; thirty percent against St. Michael's negligence; and forty-five percent against defendant's negligence.  The jury awarded plaintiff $1,175,000 for pain and suffering damages, $214,000 for past lost income, and $407,000 for future lost income.  The judge apportioned the total verdict as follows: $538,800 against St. Michael's [2] and $808,200 against defendant.  On September 1, 2000, the trial judge entered an order for judgment in favor of the plaintiff against St. Michael's and defendant for the above-stated economic and non-economic damages, and prejudgment interest.

On August 30, 2000, defendant filed a motion for new trial or, in the alternative, for remittitur.  The trial judge denied defendant's motion for a new trial and granted, in part, his motion for remittitur.  She ordered the damage award for past lost income remitted to $195,000, the damage award for pain and suffering for personal injury remitted to $500,000, and she confirmed the award of $407,000 in future lost income.  On October 13, 2000, plaintiff accepted the order of the remittitur, expressly reserving her right, under law, to appeal from the remittitur order in the event defendants appealed from the judgment.

---

[2] The judge molded the plaintiff's award against St. Michael's to $250,000 pursuant to the charitable immunity statute, *N.J.S.A.* 2A:53A–8.

St. Michael's filed a notice of appeal on November 27, 2000. Plaintiff filed a notice of cross-appeal on December 7, 2000. Thereafter, defendant filed a notice of appeal which was granted *nunc pro tunc.*

## I.

On appeal, defendant contends that the jury award was excessive and tainted by mistake, prejudice, partiality, or passion, and that the trial court erred in denying his request for a new trial on all issues. We disagree and affirm on this point.

*Rule* 4:49–1 provides that a trial judge shall grant a motion for a new trial "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." To obtain a new trial on all issues, a party must present "trial error, attorney misconduct or some other indicia of bias, passion or prejudice, impacting on the liability verdict." *Fertile v. St. Michael's Med. Ctr.,* 169 *N.J.* 481, 499, 779 *A.*2d 1078 (2001).

Defendant refers to statements plaintiff's counsel made in summation to invoke such error. Considering the latitude afforded counsel in summation, *State v. Bogen,* 13 *N.J.* 137, 140–41, 98 *A.*2d 295, *cert. denied,* 346 *U.S.* 825, 74 *S.Ct.* 44, 98 *L.Ed.* 350 (1953), we discern no error. Furthermore, the proofs supported the jury's liability verdict. Where the judge determines an excessive damage award has resulted in a denial of justice, a new trial on all issues is not available; rather, the affected party may resort to the remedy of remittitur, *Fertile, supra,* 169 *N.J.* at 491, 779 *A.*2d 1078.

## II.

Defendant claims that the jury award for past and future loss of income was speculative and unsupported by the evidence and that the remitted amount of past income loss is still too high. Plaintiff

argues that the evidence adduced at trial supports the entire jury award and seeks vacation of the remittitur order and reinstatement of the jury award.

The practice of remittitur is encouraged both at the trial and appellate levels to avoid unnecessary expenses and delays of new trials. *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 595, 379 *A.*2d 225 (1977). We are bound by the same strictures as a trial court in determining whether the grant or denial of remittitur was proper. *Id.* at 598, 379 *A.*2d 225. Unless a jury's award of damages is so disproportionate to the injury and resulting disability the trial judge should not disturb the award. *Id.* at 595, 379 *A.*2d 225. The judgment of the initial fact finder, in this case the jury, is entitled to significant consideration. *Id.* at 597, 379 *A.*2d 225. That judgment should not be disturbed absent the trial court's conclusion, after evaluating and weighing the evidence, that maintenance of the judgment would result in a manifest denial of justice. *Id.* at 597–98, 379 *A.*2d 225. The goal is not for the judge to substitute his or her judgment for that of the jury, but to correct the jury's clear error or mistake. *Ibid.* Thus, to qualify for remittitur the jury's award must shock the judicial conscience. *Id.* at 596, 379 *A.*2d 225.

The remitted amount must be what a reasonable and properly instructed jury would have awarded. *Fertile, supra,* 169 *N.J.* at 500, 779 *A.*2d 1078. To that extent, a court should remit the award to the "highest figure that could be supported by the evidence . . . ." *Ibid.* For the benefit of a reviewing court, the trial court's determination to remit must be presented in a carefully reasoned, factually supported and articulated opinion. *Baxter, supra,* 74 *N.J.* at 597, 379 *A.*2d 225. Where the trial court fails to fully set forth the reasons for its determinations, or when those determinations rest solely on the record, this court is not required to defer to the trial court's "feel of the case." *Id.* at 600, 379 *A.*2d 225 (citing *Dolson v. Anastasia,* 55 *N.J.* 2, 7, 258 *A.*2d 706 (1969)).

The judge's opinion supports her order of remittitur of the jury's award of past wage loss and denial of remittitur of the

award of future loss of income. It does not, however, support her order of remittitur of the jury's non-economic damages award.

An injured party has the right to be compensated for loss of income damages. *Caldwell v. Haynes,* 136 *N.J.* 422, 433, 643 *A.*2d 564 (1994). Those damages must be calculated to reflect the plaintiff's actual loss of earnings. *Id.* at 434, 643 *A.*2d 564. Therefore, plaintiffs who seek to recover those losses must prove their net income after taxes. *Id.* at 436, 643 *A.*2d 564.

Plaintiff's proofs established that she had a net annual income prior to the accident of $26,000. The trial court remitted the past wage loss from $214,000 to $195,000, based on the jury's incorrect mathematical calculations of that award. According to the court,

> Clearly, we don't get into the minds of jurors, we give them guidance. I gave that terribly boring charge I'm required to do about wages, etcetera. But where you can tell that they had gone off the mark is when it comes to the past wages, they're clearly told very simply, "You take what was lost, you multiply it by the amount of years, and you come out to it. You don't add into it what you think they might have done on overtime." They blew it. They gave her more than they should have.
>
> Clearly, all they're entitled to do is to say, "This is what she said she made, this is what she said lost, you multiply it by seven and a half years." They're coming up with the figure of $214,000 is not based in the facts that were presented to them. The facts clearly show $195,000 for the past lost wages. It will be reduced to $195,000.

The judge properly corrected the jury's calculation of lost income to reflect what the plaintiff actually lost: $26,000 per year for seven and one-half years. To the extent that the additional jury award was attributable to overtime wages rather than a multiplication error, there was no specific testimony to support an overtime award.

We discern no abuse of discretion in the trial judge's confirmation of the $407,000 jury award for future lost wages. The judge adequately instructed the jury on plaintiff's burden of establishing economic wage loss and in its calculation, and on plaintiff's obligation to make "reasonable efforts" and "ordinary care" to earn some income and "minimize the damages due to loss

of earnings." The jury is presumed to have followed those instructions. *State v. Manley*, 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969). In reaching its award, it appears that the jury used the proper methodology in deducting plaintiff's net earnings as a hostess as mitigation of her loss of income for her twenty-two year work expectancy from her net earnings at the time of the injury for the same period, with upward adjustments for salary increases and inflation and downward adjustments for reduction to present value. *Caldwell, supra*, 136 *N.J.* at 440, 643 *A.*2d 564. The jury heard expert testimony about the nature and extent of plaintiff's injuries and plaintiff's testimony as to her medical complaints and her attempts to obtain employment after the accident. Plaintiff underwent multiple surgeries and a course of treatment that lasted over five and one-half years. Intermittently, she was hospitalized for periods of time and confined to a wheelchair until she progressed to crutches and then a quad cane. Plaintiff's medical experts all testified that she would require a sedentary type of job because she could no longer stand or walk for long periods of time. Plaintiff testified that she could not return to her job as a security guard or to her job as a bartender at the Peppermint Lounge where she had to stand all night. Furthermore, plaintiff did not own a car. After being released by Dr. Oppenheim, she testified that she looked for receptionist jobs but most of them required a car since they were located "so far out." Plaintiff was limited in her job search because many of the jobs, such as a cashier, required standing for long periods of time. She testified that she found it difficult to stand while waiting up to an hour to catch the bus to Mountainside when she worked in customer services at Sears for three weeks during Christmas time in 1998. Plaintiff obtained employment at Marshall's afterwards tagging merchandise in the stockroom but when a new supervisor was hired who required her to carry merchandise and walk to each department in a large store, she had to leave the job. Plaintiff had only a GED with no special training and attempted to take a class through the New Jersey Unemployment Agency but it was full. Plaintiff eventually obtained employment as a hostess in

May 1999. Considering the intense treatment plaintiff underwent, the complexities that followed, and plaintiff's limited education and skills, the jury could have reasonably concluded that plaintiff used her best efforts to seek employment and, therefore, attempted to mitigate her damages.

The more problematic issue is the trial court's remittitur of plaintiff's non-economic damages award. In remitting plaintiff's pain and suffering award from $1,175,000 to $500,000, the trial judge stated:

> With regard to the injury of the fractured ankle, or it was a little bit more than that, was the spiral fracture of the tibia and fibula. She did have a long course. She certainly did have some more surgery than might have been necessitated. But Dr. Oppenheim clearly said that even without the malpractice, it was a serious injury and would still have a serious problem.
>
> After his care, she had a satisfactory result. She was relatively pain free, no appreciable ankle discomfort. There was an achieved union of the bones. The correction of the malrotation that she had presented with and there was a correction of the original leg discrepancy and that, in fact, she was able to return to utilizing two-inch heels.
>
> She did present with scars. There were scars ... some of which would have been there, albeit with no malpractice, some of which were accorded by the multiple surgeries. But when the jury awards a verdict for an injury of that nature which, unfortunately, is more common as the doctors have indicated than people realize, for a $1,175,000 for that injury, this court says my God, *if that's what you get for a broken leg, what do you get for some other injuries? Way off the mark.* That verdict will be reduced to $500,000.

[Emphasis added.]

The trial judge's statement, "if that's what you get for a broken leg, what do you get for some other injuries," bespeaks her flawed characterization of plaintiff's case. It is not the broken leg that is the source of damages here but the malpractice in not fixing the leg so that it would reach its optimum healing potential. The parties did not dispute the nature of plaintiff's injury; the dispute centered on defendant's negligence before, during and after the initial surgery, which necessitated the subsequent surgeries. The expert testimony presented by plaintiff is sufficient to support the jury's finding of negligence on the part of defendant. In addition, plaintiff's experts causally connected her injuries to defendant's negligence. Particularly, the proofs established that

plaintiff would not have suffered from angulation or discrepant limb length and would not have required *any* of the subsequent surgeries absent that negligence.

The source of the damages is the ensuing pain and suffering during the five and one-half year course of treatment, continuing through the date of trial, and which she will have to endure throughout her lifetime. Doctors Oppenheim, Dunn and Stefanelli further concluded that the permanent losses were caused by the negligence of defendant.

Over the five and one-half year period of treatment, plaintiff underwent five or six surgeries, including one to re-break her leg and recut the bone. At one point, she was confined to a nursing home because her legs were not capable of bearing weight. She also had to wear a bulky external fixation device for six months, had to walk with a cast and a cane, and suffered a permanent disability as a result of defendant's first operation, atrophy of her leg muscles, inability to exercise, and extensive external and internal physical scarring from the surgeries. Plaintiff testified as to her constant pain, even up to the date of trial and her fifty-pound weight gain because of inability to exercise. All of plaintiff's medical experts agreed that she will experience pain and discomfort in the future as a result of her permanent injuries.

Here, the jury as fact finders after listening to the testimony of plaintiff and numerous experts, found plaintiff's experts more credible. The record as a whole reveals that while the jury award of $1,175,000 may be considered generous, it is not so disproportionate to the injury or resulting disability to constitute a miscarriage of justice. *See Fertile, supra,* 169 *N.J.* at 500, 779 *A.*2d 1078; *Baxter,* 74 *N.J.* at 595, 379 *A.*2d 225. The trial judge should not have interfered with the award.

### III.

On appeal, defendant asserts that the form of judgment entered by the trial court incorrectly assesses prejudgment interest from the date plaintiff filed her complaint, contrary to the December 6, 1996 order of another judge, which suspended pre-

judgment interest until May 10, 1997. At oral argument, counsel for defendant advised that he did not focus on the pre-judgment interest provision of the December 6, 1996 order until he was preparing his appendix in connection with this appeal. He then filed a motion with the trial judge under *Rule* 4:50 to amend her order consistent with the prior order. Counsel for plaintiff advised that he opposed the motion, claiming that he had never been served with the prior order. On January 11, 2002, the judge denied the motion for lack of jurisdiction because the case was under appeal. The record is insufficient for this court to make a determination as to the validity of the December 6, 1996 order. Accordingly, we remand this issue to the Law Division for consideration of defendant's *Rule* 4:50 motion.

## IV.

The order denying defendant's motion for a new trial is affirmed. The order remitting plaintiff's past lost income award and denying remittitur of plaintiff's future loss of income award is also affirmed. The order remitting plaintiff's non-economic damages is reversed and the jury award of $1,175,000 is reinstated. The issue of the date for assessment of pre-judgment interest is remanded to the Law Division. We do not retain jurisdiction.