967 A.2d 868 (2009)
406 N.J. Super. 281
Laurie L. RILEY and Gregory F. Riley, III, married individuals, and Laurie L. Riley as guardian ad litem for her minor son, Cody A. Rohm, Plaintiffs-Appellants/Cross-Respondents,
v.
John P. KEENAN, Defendant-Respondent/Cross-Appellant, and
State Farm Insurance Company, Defendant.
Laurie L. Riley and Gregory F. Riley, III, married individuals, and Laurie L. Riley as guardian ad litem for her minor son, Cody A. Rohm, Plaintiffs-Appellants/Cross-Respondents,
v.
Brad's Red Tavern, Inc., t/a Farrell's American Bistro, Defendant-Respondent/Cross-Appellant, and
Glenn Habina & Sons, Inc. and Wyfre, Inc., t/a Naylor's Liquor & Bar, Defendants-Respondents.
DOCKET NO. A-6054-06T3.
Superior Court of New Jersey, Appellate Division.
Argued March 4, 2009.
Decided April 2, 2009.
*871 Richard Grungo, Jr., Princeton, argued the cause for appellants/cross-respondents (Archer & Greiner, attorneys; Mr. Grungo, on the brief).
L. Patrick Dacey argued the cause for respondent/cross-appellant Brad's Red Tavern, Inc., t/a Farrell's American Bistro (Bolan Jahnsen Dacey, attorneys; Elizabeth A. Wilson, on the brief).
Tricia E. Habert argued the cause for respondent Glenn Habina & Sons, Inc. (Mayfield, Turner, O'Mara, Donnelly & *872 McBride, attorneys; Ms. Habert, on the brief).
Neal A. Thakkar, Westmont, argued the cause for respondent/cross-appellant John P. Keenan (Sweeney & Sheehan, attorneys; Mr. Thakkar, on the brief).
Respondent Wyfre, Inc., t/a Naylor's Liquor & Bar has not filed a brief.
Before Judges AXELRAD, PARRILLO and MESSANO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
This matter arises from an automobile accident wherein John Keenan, while intoxicated, crashed into a car driven by Laurie Riley and occupied by her future husband, Gregory Riley. The Rileys both suffered injuries, hers resulting in permanent disability. In addition to seeking dram shop liability against two taverns, Naylor's Liquor & Bar (Naylor's) and Farrell's American Bistro (Farrell's), the Rileys, along with Laurie's son Cody (plaintiffs), brought an action against Keenan and Keenan's employer, Glenn Habina & Sons, Inc. (Habina), the latter on the theory that Keenan suffered sleep deprivation as a result of the hours Habina required him to work, which in turn was a cause of the accident. Prior to trial, Cody's loss of parental consortium claim was dismissed as were plaintiffs' claims for punitive damages against the two taverns. Following the exclusion of plaintiffs' fatigue expert's opinion as net, the action against Habina was dismissed by way of summary judgment, and a jury subsequently returned a verdict of over $3 million against the remaining defendants, apportioning liability 55% to Keenan and 22.5% to each tavern.
On appeal, plaintiffs argue error in the summary judgment dismissal of their claim against Habina, of their punitive damages claim against Farrell's, and of Cody's loss of parental consortium claim. In its cross-appeal, Farrell's contends the court erred in denying its motion for judgment notwithstanding the verdict because there was no evidence that Keenan was served alcohol at its establishment on the night in question, much less that he was visibly intoxicated at the time. Farrell's also seeks reversal or remittitur of the damages award as excessive, as does Keenan.
According to the proofs at trial, at 8:45 p.m. on August 31, 2001, Keenan, who was driving in the westbound lane of Route 40 in Pittsgrove Township, lost control of his automobile and crashed into the car driven by thirty-seven-year-old Laurie in the eastbound lane. Keenan apparently had fallen asleep and has no memory of the accident or how many beers he had prior to the accident. Toxicology tests revealed that he had a blood alcohol level of .178 at 10:10 p.m., one hour and twenty-five minutes after the accident. Keenan was charged with driving while intoxicated and pled guilty.
Cody, who was nine at the time, was not in the vehicle. Gregory injured his left hand and right knee, but was released from the hospital that night. Laurie was hospitalized for eleven days for injuries to her knee and pelvis. She has since undergone several surgeries on her knee and is in and out of physical therapy. She was unable to return to her sales job and qualified for Social Security disability (SSI) commencing summer 2003.
At the time of the accident, Keenan had been employed as a truck driver by Habina, a truck hauling contractor, since 1998, usually working six days a week and sometimes on Sundays. His typical work day driving a tri-axle truck, as recounted by Habina, would begin at 3:30 to 4:30 a.m., and end between 1:00 and 2:00 p.m., within *873 the ten-hour per day maximum driving time mandated by federal regulation.[1] Thereafter, although not required, he would routinely do mechanical work on trucks at the site, sometimes until midnight for which he was paid overtime if he worked as a mechanic more than forty hours per week. According to Keenan, in late August 2001, he was working seven days at 120 to 130 hours per week, although for the week leading up to the accident, he did not work any mechanic hours, and was therefore not in violation of daily off-duty requirements mandated by federal regulation on the day of the accident.[2]
On the day of the accident, Keenan arrived at Habina between 3:30 and 4:00 a.m., drove a dump truck, and returned to the site at about 1:00 p.m., according to the company's owner, Glenn Habina. Thereafter, Keenan hung out in the parking lot for awhile, but denied drinking any alcohol there, as the company had a "no-drinking" policy. At some point in the afternoon, Keenan went to Naylor's, which he had been frequenting for about a year before the accident, and where he would customarily consume twelve-ounce bottles of Coors Light.
Naylor's is less than a mile from Habina, located on Route 40 in Pittsgrove. Keenan arrived at the bar between 3:00 and 3:30 p.m., according to both a co-worker, Keith Wells, and the bar's owner, Wynne Naylor. By the time Wells left the establishment at 4:30 p.m., he saw Keenan drink at least two beers. Thereafter, Keenan consumed another two twelve-ounce beers between 4:30 and 5:00 p.m., but did not have anything more to drink before he left the tavern at 6:30 p.m., according to Wynne Naylor.
Keenan has no recollection of how much he had to drink at Naylor's that day or when he left. Nor could he recall if he then went to Farrell's, which was about a mile from his home. Around 8:15 that evening, however, his wife, Jeanette, spoke with her husband on his cell phone. Although not sounding intoxicated, Keenan nonetheless reported that he was at Brad's "trying to get laid." Farrell's was known as "Brad's Red Tavern" prior to its purchase in May 2001, and many locals still refer to the establishment as "Brad's." Apparently, Keenan would go to Farrell's "once in a blue moon" to either sit at the bar and have one or two twelve-ounce beers or purchase package goods.
Richard Saferstein, a forensic scientist, opined that Keenan became intoxicated (a blood alcohol level of .10) by 5:45 p.m. on the day of the accident at the earliest, and 6:10 p.m. at the latest, based on his assumption that Keenan began drinking between 1:00 and 2:00 p.m., and stopped at 8:00 p.m. According to Saferstein, there would be visual signs of intoxication at .10, although a frequent drinker would not exhibit such signs until reaching a blood alcohol level of .15. Saferstein also extrapolated Keenan's blood alcohol level at the time of the accident to be .16. In Saferstein's view, Keenan consumed thirteen twelve-ounce beers, and his alcohol intoxication was the major cause of the accident.

I
Plaintiffs contend that Habina is liable to them for the sleep deprivation suffered by Keenan due to its working hours, and that Keenan's reckless driving, even though outside the scope of his employment, was a foreseeable risk of such work fatigue. Factually, plaintiffs rely on the opinion of their fatigue expert, Merrill Mitler, *874 who opined that Keenan's work conditions caused his sleep deprivation, which combined with his intoxication at the time, caused the automobile accident, and that the confluence of these two conditions worked "to more greatly impair his abilities to sustain attention and drive than could either sleep deprivation or ethanol alone."
Even assuming work-related fatigue to be a cause of an accident, for liability to attach to an employer, there must be a duty owed to a third party injured by conduct of an employee outside the scope of his or her employment and a breach of that duty. Of course, whether a duty exists is a question of law to be decided by the court. Jerkins v. Anderson, 191 N.J. 285, 294, 922 A.2d 1279 (2007). In determining whether a duty exists, courts must weigh and balance several factors, including the foreseeability and severity of the risk of harm, the opportunity and ability to exercise care to prevent the harm, the comparative interests and relationships between or among the parties and, ultimately, fairness and public policy. J.S. v. R.T.H., 155 N.J. 330, 337, 339, 714 A.2d 924 (1998). Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists, and is based on the defendant's knowledge of the risk of injury. Id. at 337-38, 714 A.2d 924.
It needs to be emphasized at this point that the theory of recovery proposed by plaintiff here is not one of vicarious or imputed liability, but rather of primary negligence on the part of the employer. In other words, while the doctrine of respondent superior may work to extend recovery against an employer to third parties injured under circumstances showing a sufficient nexus to the employer  employee relationship, i.e., where the employee's tortious acts are committed in the course or scope of employment, plaintiff in this instance seeks to impose direct liability on the employer for the negligence of an employee committed outside the workplace and not in the course of employment. Plaintiff offers, however, no further insight as to when precisely the duty arises, to what extent it runs, what it entails or where the line should be drawn.
No New Jersey authority supports the theory of recovery advanced by plaintiffs here. Elsewhere, it has been suggested that the imposition of such a legal duty should depend on an employer's misfeasance, as opposed to nonfeasance, namely, whether the employer's affirmative action has created a foreseeable risk that harm might occur once the employee is outside the scope of his or her employment, and whether the fatigue arose out of, and in the course of, employment. See Gene P. Bowen, Note, Wherein Lies the Duty? Determining Employer Liability for the Actions of Fatigued Employees Commuting From Work, 42 Wayne L.Rev. 2091, 2103-04, 2109, 2115 (1996).
Where the fatigue factor is raised, out-of-state authorities rely on a variety of factors in articulating the nature of an employer's duty to third parties, none of which, by the way, are implicated here. For instance, Texas courts focus on the employer's knowledge of the employee's incapacity, and the extent of control exerted by the employer over the employee. Escoto v. Estate of Ambriz, 200 S.W.3d 716, 724 (Tex.App.2006). In Duge v. Union Pac. R.R. Co., 71 S.W.3d 358, 360 (Tex.App.2001), a railroad employee worked a regular day and then worked all night at a train derailment. After working for twenty-seven straight hours, the employee was dropped off by his supervisor at the company parking lot where his truck was parked. Ibid. As the employee drove home, he caused a fatal accident. *875 Ibid. The trial court's grant of summary judgment to the company was affirmed, and the court declined to impose a duty on the company, because there was no evidence that the employee appeared incapacitated prior to leaving the company's premises, and because during his commute home, prior to the accident, the employee stopped and visited a friend for an hour to an hour-and-a-half. Id. at 360-64.
Conversely, where an employer knew an employee drank on the job and on the night of the accident sent him home because he was drunk, the employer was held liable to the widowers of the wives killed in the automobile accident that occurred shortly after the employee left work. Otis Eng'g Corp. v. Clark, 668 S.W.2d 307 (Tex.1983). See also Brockett v. Kitchen Boyd Motor Co., 264 Cal.App.2d 69, 70 Cal.Rptr. 136 (1968). In Otis, the court reasoned that when an employer exercised control over its employee because of his incapacity, the employer had a duty to take such action as a reasonably prudent employer under the same or similar circumstances would take to prevent the employee from causing an unreasonable risk of harm to others. Otis, supra, 668 S.W.2d at 311.
In a similar vein, an employer was held liable for violating its own company policy in working an eighteen-year-old high school student unreasonably long hours, knowing he would be a hazard to himself and others when he drove himself home and caused an accident. Faverty v. McDonald's Rests. of Oregon, Inc., 133 Or.App. 514, 892 P.2d 703, 705 (1995). There, the employer had a policy of not scheduling high school students to work later than midnight once a week, and when it did, not to work employees double shifts in one day. Id. at 705, 709. Notwithstanding, employees sometimes complained about being tired after closing, and the employer was aware that at least two of its employees had automobile accidents as a result of falling asleep while driving home after working late shifts. Ibid. During the week leading up to the date of the accident, the employee in question worked five nights, one past midnight. Id. at 705. On the day of the accident, the employee worked his regular shift from 3:30 p.m. to 7:30 p.m., followed by a cleanup shift from midnight to 5:00 a.m., and then another shift from 5:00 a.m. to nearly 8:30 a.m. Ibid. The employee then asked to be excused so that he could rest, and the manager agreed. Ibid. The employee then began driving home, and a short time later caused a head-on collision. Ibid. The court concluded that, under those circumstances, a reasonable jury could find that the defendant knew or should have known that working the student so many hours would impair his ability to drive home safely. Id. at 709-10.
Similarly, in Robertson v. LeMaster, 171 W.Va. 607, 301 S.E.2d 563, 564-65 (1983), an employer required a nineteen-year-old employee to work twenty-seven straight hours as a laborer before granting him permission to go home. The employee fell asleep while he was driven to his car by another employee. Id. at 565. He then began the fifty-mile drive to his home, during which he caused an accident. Ibid. It was held in that instance that the employer owed the injured plaintiff a duty because the employee's conduct prior to the accident, known to the employer, created a foreseeable risk of harm. Id. at 567-69. According to the court, requiring the employee "to work over 27 hours and then setting him loose upon the highway... created an unreasonable risk of harm to others that was foreseeable." Id. at 567.
Correspondingly, where there was no foreseeable risk of harm because of a *876 lengthy gap between work shifts, liability did not inhere. In Depew v. Crocodile Enters., Inc., 63 Cal.App.4th 480, 73 Cal. Rptr.2d 673, 674 (1998), the employee fell asleep while driving home from work early Sunday morning, causing a fatal accident. The employee had worked a double shift at a restaurant, 8:30 a.m. until 2:00 a.m., on Friday, and a night shift, 6:00 p.m. until midnight, on Saturday. Id. at 674-75. The court found: "As we see it, a break of 16 hours between shifts, followed by 6 hours of work, is not the type of excessive workload that makes falling asleep at the wheel and killing another driver" a foreseeable risk. Id. at 678.
Where a work gap is involved, courts sometimes frame the duty question alternatively as whether the employee's fatigue arose out, and in the course, of his employment. In other words, was the employee's sleep deprivation a direct result of his employment or rather a consequence of activity wholly within the employee's control? In Black v. William Insulation Co., Inc., 141 P.3d 123, 125, 128-29 (Wyo.2006), the employee fell asleep while driving home from work, causing his vehicle to cross the centerline, resulting in a fatal accident. The court concluded that a ten-hour shift within a twenty-four hour period, and thirteen-and-a-half hours between shifts during the work week, was not an objectively unreasonable period of work, particularly given that the employer had no knowledge of the employee's fatigued state on the day of the accident. Id. at 130-31.
However the nature of the employer's duty to third parties may be articulated, we perceive no sound basis for its application here. The summary judgment record discloses that Habina's drivers generally drove eight to nine hours a day, ending work in the early afternoon, therefore affording Keenan, at minimum, a fourteen-hour break between driving shifts, comparable to those in Depew and Black. Moreover, Habina neither violated company policy nor required Keenan to work extra hours as a mechanic. Nothing in the record indicates that company officials were aware of the number of hours of sleep Keenan was getting in the time period leading up to the accident or that Keenan was fatigued. In fact, there is no evidence that Keenan ever asked to go home and was refused, or that he fell asleep at the job site before driving off, or that any of Habina's employees had had automobile accidents while driving home after working long hours. And finally, unlike in both Faverty and Robertson, here there was an extended gap of some seven hours between when Keenan left work and the accident, during which time he voluntarily became intoxicated. Under the circumstances, in the absence of any affirmative action on the employer's part that might have reasonably created a foreseeable risk of harm to others once Keenan left the job site, we decline to impose upon Habina any legal duty to third parties such as plaintiffs.
Although this holding renders moot plaintiffs' other claim on this point, we nevertheless find no abuse of discretion in the trial court's exclusion of the fatigue expert's testimony as a net opinion. See Hisenaj v. Kuehner, 194 N.J. 6, 25, 942 A.2d 769 (2008). That opinion, which seeks to establish a synergistic connection between sleep deprivation and alcohol intoxication and, further, a causal link to the accident in question amounts to no more than a bare, subjective conclusion, unsupported by factual evidence. See Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981).
An expert is required to give the "why and wherefore" of his or her opinion, not just a mere conclusion or speculation. Koruba v. Am. Honda Motor Co., *877 396 N.J.Super. 517, 525-26, 935 A.2d 787 (App.Div.2007), certif. denied, 194 N.J. 272, 944 A.2d 32 (2008). To support a causal connection between the act complained of and the resulting injury or damage, experts must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable. Id. at 526, 935 A.2d 787. They must be able to point to generally accepted, objective standards of practice and not merely standards personal to them. Ibid.
Here, as noted by the trial judge, plaintiff's expert, a psychologist, made no reference to objective scientific or toxicological studies or publications. See Smith v. Estate of Kelly, 343 N.J.Super. 480, 497, 778 A.2d 1162 (App.Div.2001) (holding that claim of "religious duress" as reason why plaintiff delayed in commencing litigation was net opinion because it lacked factual basis); Kaplan v. Skoloff & Wolfe, P.C., 339 N.J.Super. 97, 103, 770 A.2d 1258 (App.Div.2001) (finding net opinion where expert failed to reference any written document in support of duty of care in legal malpractice action). Cf. Hisenaj, supra, 194 N.J. at 24, 942 A.2d 769 (finding that opinion was not a net opinion because expert relied on studies in forming it). And, while an expert may rely on his own knowledge, Bellardini v. Krikorian, 222 N.J.Super. 457, 463, 537 A.2d 700 (App. Div.1988), there is nothing in the record to indicate that this expert had any specialized knowledge of the synergistic effect of sleep deprivation and alcohol intoxication.

II
We summarily reject plaintiffs' next argument that Cody's claim for loss of parental consortium was erroneously dismissed. Suffice it to say, New Jersey does not recognize such a cause of action. Russell v. Salem Transp. Co., 61 N.J. 502, 504, 295 A.2d 862 (1972). In support of its holding, the Court cited several reasons, including: out-of-state courts' rejection of the cause of action; the "substantial accretion of liability against a tortfeasor" by adding as many companion claims as the injured parent had minor children, particularly if both parents were injured; the cost to the insured community as a whole; conflicts in the family related to apportionment of settlement offers; and problems of remoteness and speculativeness of damage claims. Id. at 504-07, 295 A.2d 862. In addition, the Court noted that reflection of the disadvantages to children of injured parents is frequently found in the awards to parents on their own claims. Id. at 507, 295 A.2d 862.
Needless to say, we are bound by the holdings of the Supreme Court, Moscatello v. Univ. of Med. and Dentistry of New Jersey, 342 N.J.Super. 351, 363-64, 776 A.2d 874 (App.Div.), certif. denied, 170 N.J. 207, 785 A.2d 435 (2001), and should normally defer to the Supreme Court with respect to the creation of a new cause of action. Tynan v. Curzi, 332 N.J.Super. 267, 277, 753 A.2d 187 (App.Div.2000). Indeed, we rejected a similar challenge to the Russell holding in the not-too-distant past, Adelman v. Lupo, 291 N.J.Super. 207, 221, 677 A.2d 230 (App.Div.), certif. denied, 147 N.J. 259, 686 A.2d 761 (1996), and discern no great change in circumstances to warrant reconsideration.

III
Farrell's maintains that it was entitled, alternatively, to a directed verdict or judgment notwithstanding the verdict because there was a lack of competent proof that Keenan was served alcohol at its establishment, much less while visibly intoxicated. The trial judge disagreed, and in denying Farrell's post-trial motion, reasoned:

*878 We know that the time of the accident was roughly about 8:45. We know that his blood alcohol level at about 10:10 was in a neighborhood of .18.... We know that Saferstein extrapolated the level of his blood alcohol to be [.16] at the time of the accident. We know that Saferstein testified the visual signs of intoxication would occur after reaching .10. We know from Dr. Saferstein's testimony that a frequent drinker would not show those signs until approximately he reached a blood alcohol level of .15. We know that Saferstein provided the jury with a chart which indicated the continuing rising of his blood alcohol level from two o'clock p.m. through roughly the time of the accident.
. . . .
We also know from Mr. Keenan's testimony that his habit ... was that if he, in fact, was at ... Farrell's tavern, he would do one of two things. He would either stay there for a couple of hours, have a couple of beers, or he'd buy package goods. And in this particular instance there is no evidence that he bought package goods.
What's the other evidence he was at Farrell's? Well, the evidence ... was that he made a phone call to his wife indicating that he was at Brad's Tavern, which ... Mrs. Keenan testified was also known as Farrell's....
. . . .
[I]f you listened carefully to Mrs. Keenan's testimony she said that when Mr. Keenan talked to her from the bar, he said, I'm at Brad's, and ... she said something to the effect of, what are you doing at Brad's, and I think he said, I'm trying to get laid. And although he did not sound intoxicated, it was an uninhibited statement by him ... and it would be easy for the jury to infer that it was... somewhat out of character and ... although one may not sound intoxicated, are [sic] another indicia of intoxication.
. . . .
[T]he time that he left Naylor's was roughly anywhere from 6 ... to 6:45.... And so he disappeared, we'll say, ... between the time he left Naylor's and the time he arrived at the point of the impact, for two hours, and again it would be ... reasonable to infer, based upon the totality of the evidence, that he arrived at Farrell's at around 7 p.m., [and] left at roughly 8:30 p.m., so an hour-and-a-half window existed where the jury could reasonably infer that he was at Farrell's and drinking.
A motion for a judgment notwithstanding the verdict under Rule 4:40-2, like a motion for judgment at the close of the plaintiff's case under Rule 4:40-1, must be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in the plaintiff's favor. Lanzet v. Greenberg, 126 N.J. 168, 174, 594 A.2d 1309 (1991). In each case, the court must accept as true all the evidence which supports the position of the party defending against the motion and according it the benefit of all inferences which can reasonably and legitimately be deduced therefrom, and if reasonable minds could differ, the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). In determining the propriety of such a ruling, we apply the same standard as the trial judge. See Frugis v. Bracigliano, 177 N.J. 250, 269, 827 A.2d 1040 (2003).
Under the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act (Act), N.J.S.A. 2A:22A-1 to -7, "[a] licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person." N.J.S.A. 2A:22A-5(b). "Visibly intoxicated" is defined by the Act as "a state *879 of intoxication accompanied by a perceptible act or series of acts which present clear signs of intoxication." N.J.S.A. 2A:22A-3. The Act further provides that a person who sustains injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover "damages" from the server only if the server served a visibly intoxicated person, the injury or damage was proximately caused by this negligent service of alcohol, and the injury or damage was a foreseeable consequence of the negligent service. N.J.S.A. 2A:22A-5(a). Damages may be awarded in actions brought under the Act subject to the limitations set forth in the comparative negligence statute. N.J.S.A. 2A:22A-6(b). By so doing, the Legislature sought to assure that comparative negligence principles would be applied to apportion fault in dram shop actions. Steele v. Kerrigan, 148 N.J. 1, 15, 689 A.2d 685 (1997).
Even if evidence of the cell phone conversation between Keenan and his wife could sustain a finding of Keenan's presence at Farrell's, and even when viewed most favorably to plaintiffs, the proof is utterly wanting of Keenan's consumption of alcohol or his display of visible signs of intoxication while on the premises. Certainly, there is no direct proof of either. And the inferences of such behavior that plaintiffs ask us to draw are neither reasonable nor rational, based as they are on faulty premises or dubious circumstantial evidence. More pointedly, the fact that Keenan himself admits generally to have patronized Farrell's in the past, absent any greater specificity or proof of regularity, is simply not the type of circumstantial evidence of habit or custom from which it may reasonably be inferred that Keenan acted in conformity with the alleged practice on the evening in question. N.J.R.E. 406; see also Verni ex rel. Burstein v. Stevens, 387 N.J.Super. 160, 190-91, 903 A.2d 475 (App.Div.2006), certif. denied, 189 N.J. 429, 915 A.2d 1052 (2007). Compare State v. Wormley, 305 N.J.Super. 57, 65, 701 A.2d 944 (App.Div.1997) (evidence that a witness regularly used heroin and marijuana on weekends was "probably insufficient" under N.J.R.E. 406(a) to establish that he used drugs on a Thursday that he claimed he was robbed), certif. denied, 154 N.J. 607, 713 A.2d 498 (1998) with State v. Radziwil, 235 N.J.Super. 557, 563-66, 563 A.2d 856 (App.Div.1989) (testimony that over a four-year period the defendant patronized the same establishment nearly every weekend and invariably became intoxicated shortly after his arrival there, held admissible to show that he became intoxicated there on the night he was involved in a fatal accident six miles away, it having been a weekend night on which he had admittedly stopped at his favorite watering hole), aff'd. o.b., 121 N.J. 527, 582 A.2d 1003 (1990) and State v. Kately, 270 N.J.Super. 356, 363-64, 637 A.2d 214 (App. Div.1994) (testimony of the defendant's friends demonstrating his specific pattern of alcohol consumption and intoxication on a nightly basis held admissible habit evidence, relevant to whether the defendant acted recklessly by driving drunk on the night of the accident, which occurred after the defendant and his friends had been together for several hours). In contrast here, instead of suggesting a routine practice probative of Keenan's conduct at Farrell's on the night in question, the evidence invites sheer speculation whether the purpose of Keenan's visit to Farrell's was to use the restroom, meet an acquaintance, socialize with strangers, or continue drinking; and if the latter, whether he was denied service in any event.
Equally lacking is any proof that while at Farrell's, Keenan was perceptibly intoxicated. Saferstein's testimony as to when *880 Keenan would have begun to exhibit visible signs of intoxication was necessarily vague and imprecise. In the first place, the expert testimony was not specific to Keenan, and did not consider either his personal condition or individual circumstances. More significant, Saferstein based his reading on the assumption that Keenan began drinking at 1:00 to 2:00 p.m., when in fact, there was no competent proof of this[3] and the evidence did not place him at Naylor's until about 3:30 p.m. In fact, Saferstein acknowledged that had Keenan actually started drinking later in the day, his blood alcohol levels extrapolated by the expert would also have registered at correspondingly later times. For instance, if Keenan began drinking at 3:30 p.m., he would not have shown signs of intoxication only three hours later, at 6:30 p.m. Although Saferstein did not then indicate a precise time when Keenan would have been visibly intoxicated, he indicated, as to one of his graphs, that Keenan might not have been showing visible signs of intoxication until 8:00 p.m. We are, therefore, satisfied from our review of the record that neither Farrell's service of alcohol to Keenan nor Keenan's visible intoxication at the time could reasonably and legitimately be deduced from the competent trial evidence. As such, reasonable minds could not find these necessary statutory elements to impose dram shop liability upon Farrell's.
Consequently, we vacate the judgment against Farrell's and remand for retrial of liability allocation as between the remaining defendants. Our disposition of this issue, of course, renders moot plaintiffs' claim that the court erred in holding Farrell's immune from liability for punitive damages and Farrell's claim that plaintiffs' counsel's comments, supposedly appealing to the sympathy and passion of the jury, warranted a mistrial.

IV
Farrell's final argument, joined in by Keenan, challenges the jury's economic loss award as so disproportionate to the damages actually sustained as to constitute a manifest injustice warranting either a remittitur or new trial. We disagree.
The standard that controls our disposition is well-settled. We do not reverse a trial court's ruling on a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; Baxter v. Fairmont Food Co., 74 N.J. 588, 599, 379 A.2d 225 (1977). We defer to the trial court's determination of a witness's credibility and demeanor. Dolson, supra, 55 N.J. at 7, 258 A.2d 706; see also Carey v. Lovett, 132 N.J. 44, 66, 622 A.2d 1279 (1993) (noting that appellate courts defer to the trial court's "feel of the case"). As do trial courts, we also defer to the quantum of damages that a jury assesses unless it is so disproportionate to the injury and resulting disability shown as to shock the conscience and convince the judge that sustaining the award would be manifestly unjust. Ryan v. KDI Sylvan Pools, Inc., 121 N.J. 276, 297, 579 A.2d 1241 (1990); Baxter, supra, 74 N.J. at 596, 379 A.2d *881 225; Sweeney v. Pruyne, 67 N.J. 314, 315, 338 A.2d 193 (1975); Tonelli v. Khanna, 238 N.J.Super. 121, 130, 569 A.2d 282 (App.Div.), certif. denied, 121 N.J. 657, 583 A.2d 344 (1990); Tronolone v. Palmer, 224 N.J.Super. 92, 97, 539 A.2d 1224 (App.Div. 1988).
Where the quantum of damages is the sole source of the determination that a denial of justice has taken place, remittitur is an available remedy. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 491, 779 A.2d 1078 (2001). Remittitur is utilized to avoid unnecessary expenses and delays of new trials. McRae v. St. Michael's Med. Ctr., 349 N.J.Super. 583, 597, 794 A.2d 219 (App.Div.2002). Remittitur denies a defendant a new trial if a plaintiff consents to a specified reduction in the jury award. Fertile, supra, 169 N.J. at 491, 779 A.2d 1078. But again, unless a jury's award of damages is so disproportionate to the injury and resulting disability, a court should not disturb the award. McRae, supra, 349 N.J.Super. at 597, 794 A.2d 219. The judgment of the jury is entitled to significant consideration, and should not be disturbed absent clear error or mistake that shocks the judicial conscience and results in a manifest denial of justice. Ibid.
Here, final judgment was entered awarding Laurie an aggregate amount, including prejudgment interest, of $3,084,008.99[4] as follows: $1,250,000 for pain and suffering, $1,008,000 for future lost wages, $252,000 for past lost wages, and $190,000 for services rendered to Laurie as a result of the accident.[5] Of the total amount, Keenan and Farrell's dispute only the economic loss component, arguing that: (1) the award for lost wages grossly exceeded what plaintiffs' own expert found; (2) it is not clear whether the jury applied a net, rather than gross, wage estimate; (3) the trial court failed to provide a collateral source set-off for the SSI disability benefits Laurie received; and (4) the offer of judgment award should be vacated because once the SSI benefits are deducted from the overall award, the judgment is no longer 120% of the offer.
While it is true that plaintiffs' vocational and economic expert, Dr. Robert Wolfe, estimated Laurie's total economic loss past ($214,535) and future ($643,606)at $858,141, he used a conservative three percent growth factor for earnings capacity. He also provided a reduction for SSI benefits with the assumption that Laurie would receive lifetime benefits. Of course, the jury was free to reject these and other assumptions used by Wolfe in favor of its own common sense and experience. State v. M.J.K., 369 N.J.Super. 532, 549, 849 A.2d 1105 (App.Div.2004) (citing In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989)), appeal dismissed, 187 N.J. 74, 899 A.2d 298 (2005); see also DeHanes v. Rothman, 158 N.J. 90, 101, 103, 727 A.2d 8 (1999); Waterson v. Gen. Motors Corp., 111 N.J. 238, 248, 544 A.2d 357 (1988); Bussell v. DeWalt Prods. Corp., 105 N.J. 223, 227, 519 A.2d 1379 (1987).
Indeed, the jury could have made different assumptions about work life expectancy, discount rates, social security benefits, or inflation. Obviously, the jury could have found that a three percent growth factor was not enough to fairly compensate *882 Laurie, and concluded that her past wages were not reflective of her future prospects. This is especially so when considering that Laurie worked on commissions and had developed and begun implementing a new and innovative sales plan before the crash. Under these circumstances, the jury was free to consider Laurie's greater earnings potential that was effectively obliterated by the automobile accident. As the trial judge noted in denying defendants' post-trial motions for remittitur and/or a new trial:
From a credibility standpoint, my recognition of her is the primary wage earner. My recognition that she ... had started a new endeavor just prior to the onset of her disability. She ... got involved in a part of the business that her employer had never been involved in before. She apparently was doing pretty well with it. She was working in the evenings. She had given up some parenting time with her child, deferred it to Mr. Riley.
Conceivably the juryit's just as reasonable to infer that the jury looked at... her upward mobility and found that the 3 percent amount was conservative.... I can't place myself in the role of an additional juror, and I'm going to have to support the jury determination and deny the application for a remittitur....
We similarly find the jury's economic loss award not shocking to the judicial conscience. In our view, a future wage loss award of $1,008,000 is not a miscarriage of justice for a forty-three-year-old disabled woman with a demonstrated earnings history. We also reject defendants' other challenges to the economic loss award, finding no error in the court's instruction on damages and a clear basis in the record to sustain the award. In this regard, Wolfe expressly subtracted Laurie's "obligation to pay taxes" in the amount of $360,562, and the trial judge clearly instructed the jury that any award for loss of earnings "must be based on net take-home pay, and not on gross income." See Caldwell v. Haynes, 136 N.J. 422, 434, 643 A.2d 564 (1994). Furthermore, Wolfe estimated that Laurie would receive $358,950 in SSI benefits until age 67, subtracted that amount in his calculations, and the trial judge instructed the jury to consider the SSI benefits in the compensation determination. Although any required adjustment to a party's ultimate recovery under the collateral source rule is to be made by the court, after the jury has determined the full amount incurred, Dias v. A.J. Seabra's Supermarket, 310 N.J.Super. 99, 101-102, 707 A.2d 1391 (App.Div. 1998), we find no reason in this instance to doubt the jury's adherence to the court's charge, or that its award reflected other than a proper measure of plaintiff's economic loss.
Affirmed in part; reversed and remanded in part.
NOTES
[1] 40 CFR § 395.3 (2001).
[2] Ibid.
[3] Keenan's wife, Jeanette, testified that Jennifer Habina, company secretary and daughter of the owner, told her shortly after the accident that Keenan was among a group of workers drinking beer in the company's parking lot on August 31. Such testimony is hearsay and we perceive no legitimate basis for its admission. In any event, Jeanette did not know whether the statement was true. Jennifer denied that the conversation took place, or that she saw anyone drinking that day. Keenan denied drinking alcohol in Habina's parking lot on August 31. Glenn Habina, owner of the company, did not see anyone drinking alcohol that day.
[4] $1,725,711.40 against Keenan; $683,545.50 against Farrell's; and $674,752 against Naylor's.
[5] Gregory was awarded $50,000 for pain and suffering. After a bifurcated trial on punitive damages against Keenan, the jury awarded Laurie $88,000 in punitive damages. These features of the damages award are not challenged on appeal.