NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-6163-12T2

DANNY CAICEDO, an infant by
his Father and Natural Guardian
SEGUNDO CAICEDO, and
SEGUNDO CAICEDO, individually,

Plaintiffs-Respondents,

v.

FABIAN CAICEDO, CITY OF NEWARK
POLICE DEPARTMENT, and CITY OF NEWARK,

Defendants-Appellants.

_____

```
┌─────────────────────────────┐
│   APPROVED FOR PUBLICATION   │
│                              │
│        March 17, 2015        │
│                              │
│      APPELLATE DIVISION      │
└─────────────────────────────┘
```

Argued February 25, 2015 — Decided March 17, 2015

Before Judges Alvarez, Maven, and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-319-11.

Avion M. Benjamin, Assistant Corporation Counsel, argued the cause for appellants (Anna P. Pereira, Corporation Counsel, attorney; Steven F. Olivo, Assistant Corporation Counsel, and Ms. Benjamin, on the briefs).

Casey J. Woodruff argued the cause for respondents (Bramnick, Rodriguez, Mitterhoff, Grabas & Woodruff, LLC, attorneys; Mr. Woodruff, on the brief).

The opinion of the court was delivered by

CARROLL, J.A.D.

This appeal follows a jury verdict for damages sustained by plaintiff Danny Caicedo.[1]  Plaintiff was severely injured when the bicycle he was riding was struck by a police cruiser operated by defendant Fabian Caicedo[2] while on duty with defendant City of Newark Police Department.

Officer Caicedo had arrested an individual for a disorderly persons offense, and was transporting the prisoner to police headquarters for processing when he struck plaintiff's bicycle. At trial, the judge declined to instruct the jury that Officer Caicedo was entitled to good-faith immunity under N.J.S.A. 59:3-3, which provides that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." This appeal requires us to decide whether the statute exempts defendants from liability where the police officer had effected an arrest and was transporting the prisoner under non-emergent circumstances.  We decide that it does not.  We also reject defendants' arguments that the jury's verdict was against the weight of the evidence, and that the trial court erred in failing to order a new trial or a remittitur.

---

[1] Suit was filed by Segundo Caicedo, individually and as guardian for his minor son, Danny Caicedo.  For purposes of this opinion we refer to Danny Caicedo as plaintiff.

[2] Plaintiff and defendant Fabian Caicedo share a common surname but are not related.  For clarity we refer to defendant as Officer Caicedo.

The collision occurred on June 29, 2010, immediately following plaintiff's eighth-grade graduation. Plaintiff, accompanied by three friends, was heading north on Broadway, a busy Newark street with two lanes of traffic in each direction and a twenty-five mile-per-hour speed limit. Two of the boys were walking, while plaintiff and a friend, M.G., rode their bicycles along the shoulder of the roadway. Plaintiff testified that he was riding his bike straight, not swerving. M.G. and one of the walkers, B.P., both agreed. After a few seconds, M.G. crossed the street to return home; a minute or two later, plaintiff also decided to cross. Plaintiff described the events as follows:

> I was continuing to go straight, I was talking to them. And then after I said [bye], I looked over my shoulder [and] the light was still red. There [were] no cars in sight, so I decided to cross.
>
> . . . .
>
> . . . I turned, and all of a sudden, I just heard a loud screech[,] . . . and then I tried to turn back to the shoulder but it was too late, I got hit.

Plaintiff was then struck by Officer Caicedo's police vehicle and lost consciousness.

Plaintiff admitted that he did not cross at an intersection, and that he knew this was unsafe. Neither

plaintiff, M.G., nor B.P. heard a horn or siren before the collision. B.P., on hearing the brakes screech, turned in time to observe the impact. He was ten feet from the collision, and estimated that Officer Caicedo's vehicle was travelling at a speed of forty to forty-five miles per hour. B.P. based his estimate of the vehicle's speed on the screeching noise he heard, which lasted "about ten seconds."

M.G. glimpsed Officer Caicedo's car as it neared plaintiff, and also estimated that it was travelling at forty to forty-five miles per hour. M.G. heard the car brake, but did not see the impact. His speed estimate was based on his observation that the vehicle was travelling faster than typical Broadway traffic.

Officer Caicedo, a Newark police detective, had just arrested David Petracca, a suspected drug buyer, for wandering, and was transporting him back to headquarters in an unmarked police cruiser. Officer Caicedo and his partner, Detective Misty Camacho, searched Petracca incident to arrest and discovered no weapons. Petracca did not resist, struggle, or refuse to cooperate either during the arrest or the ride to police headquarters. Since the unmarked vehicle had no partition, Camacho sat in the rear seat next to Petracca, whose hands were cuffed behind him. The detectives were about one block from the police station when the collision occurred.

Officer Caicedo testified that he first observed plaintiff some forty yards ahead. The officer estimated that he was driving about thirty miles per hour. He saw plaintiff moving back and forth in a "snake[-]like motion" over both northbound lanes of the roadway. Contrary to the other witnesses' testimony, Officer Caicedo stated that he sounded "one quick burst" of his horn and siren when he was about thirty yards from plaintiff. After sounding his horn, he saw plaintiff move "all the way closer to the curb and [] start[] [to] rid[e] straight." At twenty yards, he moved into the left northbound lane to avoid plaintiff. According to Officer Caicedo, "[a]s that distance closed, the cyclist suddenly just turned in, like ma[d]e a hard [] left and turned in front of me. And that's when I swerved into oncoming traffic." When he was ten feet away from plaintiff, the officer was still travelling at thirty miles per hour.[3] Faced with oncoming traffic, Officer Caicedo swerved back into the northbound lanes, where his front right fender struck plaintiff's rear tire. When asked why he did not stop on seeing plaintiff, Officer Caicedo responded: "I wanted to get back to

---

[3] At trial, when questioned how fast he was traveling, Officer Caicedo responded: "I believe it was like [twenty] miles per hour." He was then confronted with his deposition testimony that he was traveling thirty miles per hour, and conceded he "was traveling the same speed at [forty] yards away as [he] was at [ten] feet away."

[headquarters] due to the fact that we didn't have a cage in the car, I wanted to get back safely and my observation was that I could safely go around into the second right lane around the cyclist."

The other two occupants of the police vehicle also testified. Camacho recounted that "as I look[ed] up I [saw] that my partner [was] going onto the other side, the opposite side of traffic [into] oncoming traffic. And then to avoid colliding with oncoming traffic he swerve[d] again towards the right, and I remember that's where the impact occurred." Petracca testified that before the collision he saw plaintiff "just riding kind of in circles on his bicycle." Officer Caicedo later "swerved to the left to try to avoid impact and stepped on the brakes." Petracca further stated: "I don't believe [Officer Caicedo] made it into the other lane of traffic, but pretty substantially I would say he swerved to try to avoid impact." Neither detective's report recorded that Officer Caicedo sounded his horn before the collision.

Plaintiff suffered a comminuted fracture of his right femoral shaft. He underwent two surgeries, physical therapy, and treatment for neck and back pain. He suffers from a leg-length discrepancy and walks with a permanent limp.

A-6163-12T2

Prior to trial, plaintiff made an in limine motion to bar defendants from arguing the good-faith immunity defense. The trial judge reserved decision on the motion until she heard the police testimony. Ultimately, the judge declined to instruct the jury on the defense, reasoning:

> I have found cases that go both ways. Cases that would say that this was the continuation of an effectuation of an arrest. And cases that have said it's just merely transporting. Now I note for the record, I have no evidence or testimony . . . that this was any sort of . . . high crime. This was not some internationally wanted suspect who was in the back of the car. There's no evidence that he struggled. There was no evidence that he resisted. Indeed he's charged with wandering[,] a disorderly persons offense.
>
> So even though I don't mean to diminish in any way, nor substitute my judgment for the police officer['s] sense of danger, I don't even have any testimony that [] anybody thought they were in much danger. . . . For those reasons I don't think the immunity [applies.]

The jury found in plaintiff's favor and apportioned negligence at eighty percent to Officer Caicedo and twenty percent to plaintiff. The trial court molded the $3,000,000 verdict accordingly, and judgment was entered in plaintiff's favor for $2,400,000.

Defendants moved for a new trial or, in the alternative, for a remittitur. They argued that the verdict was excessive

and against the weight of the evidence. Defendants also contended that the court erred in denying the jury instruction as to their good-faith immunity defense. While the trial judge characterized the verdict as "high," she found no basis to disturb it. As to the immunity defense, the judge ruled:

> [I]t's clear [that] the testimony of the officers if anything supported [] plaintiff's position that it was a mere transportation function that they were providing. There was no[t] one word of testimony about the neighborhood being something that they were concerned with lingering [in] with an arrestee who was a buyer []. There was nothing, nothing, absolutely nothing said by either officer that would indicate they had any sort of concerns of safety that were heightened by virtue of this being an arrest, versus any concerns they'd normally have if they were just [] transporting a prisoner. And so for those reasons the [c]ourt denied the immunity defense.
>
> . . . I think[,] given the record in this case, given the absence of any testimony about any concerns that anybody had or heightened concerns that would take this from a mere transportation to the continuation of an arrest, that the [c]ourt's initial ruling was the correct and accurate one.

## II.

On appeal, defendants renew the arguments they advanced in their new trial motion. They contend that the trial court erred in failing to instruct the jury on good-faith immunity, and that the verdict was both against the weight of the evidence and

8

excessive.  Defendants further argue that the trial court erred in denying their motion for a new trial or a remittitur.  We address these arguments in turn.

A.

We first consider whether defendants enjoyed immunity under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3. "The TCA provides general immunity for all governmental bodies except in circumstances where the Legislature has specifically provided for liability."  Kain v. Gloucester City, 436 N.J. Super. 466, 473 (App. Div.) (citing N.J.S.A. 59:1-2 and 2-1), certif. denied, 220 N.J. 207 (2014).  Thus, the TCA's dominant theme is immunity, with liability as the exception.  D.D. v. Univ. of Med. & Dentistry of N.J., 213 N.J. 130, 134 (2013); Rochinsky v. Dep't of Transp., 110 N.J. 399, 408 (1988).  "The public entity bears the burden of proof for establishing immunity.  In determining if a public entity is immune, courts first identify the culpable cause of the accident and . . . ask if that identified cause or condition is one that the Legislature intended to immunize."  Kain, supra, 436 N.J. Super. at 473 (citations and internal quotation marks omitted).

Where a public entity is immune from liability for injury, so too is the public employee.  N.J.S.A. 59:3-1(c).  Pertinent to this appeal, N.J.S.A. 59:3-3 specifically provides that "[a]

9

public employee is not liable if he [or she] acts in good faith in the execution or enforcement of any law."  The TCA does not, however, "exonerate a public employee for negligence arising out of his [or her] acts or omissions in carrying out his [or her] ministerial functions."  N.J.S.A. 59:3-2.

Defendants argue that they are entitled to the good-faith immunity bestowed by N.J.S.A. 59:3-3.  They contend that Officer Caicedo was enforcing the law when the collision occurred because the police had not yet completed the suspect's arrest.  In support of this position they point to the Newark Police Department's policy procedures for processing arrests, which include transporting a prisoner to the precinct of arrest and completing all required reports.

Plaintiff argues that N.J.S.A. 59:3-3 immunity is inapplicable under the facts presented, and that courts have not applied it to situations where police are involved in ministerial acts, such as patrolling the streets or transporting prisoners.  Rather, plaintiff contends that this statutory immunity attaches only where the police are acting under heightened circumstances, including responding to a crime, accident, or emergency in progress, or where they are called upon to make split-second decisions.

New Jersey caselaw appears to favor plaintiff's position. See, e.g., Alston v. City of Camden, 168 N.J. 170, 187-88 (2001) (applying the immunity to an officer pursuing a drug suspect on foot, emphasizing the "split-second judgments" such circumstances often require); Canico v. Hurtado, 144 N.J. 361, 365-66 (1996) (applying the immunity to an officer responding to a bank alarm, noting that such responses "often require split-second judgments"); Dunlea v. Twp. of Belleville, 349 N.J. Super. 506, 509 (App. Div.) (applying the immunity to officers responding to a burglary in progress), certif. denied, 174 N.J. 189 (2002). Thus, if the collision here occurred during an emergency response, the result would be clear since good-faith immunity no doubt "encompass[es] the operation of police vehicles by police officers acting within the scope of their duties and in response to an emergency." Canico, supra, 144 N.J. at 366-67.

As TCA immunity often arises in the context of police pursuits, our courts have frequently applied N.J.S.A. 59:5-2(b) and 5-2(c) (which, respectively, provide immunity from injuries caused by escaping persons and by the pursuit of such persons), obviating the need to consider N.J.S.A. 59:3-3 good-faith immunity. See, e.g., Tice v. Cramer, 133 N.J. 347, 367 (1993) (applying N.J.S.A. 59:5-2(b)(2) and (b)(3) and thus not reaching

the question of good-faith immunity for officers pursuing a vehicle that failed to heed their commands); <u>Torres v. City of Perth Amboy</u>, 329 <u>N.J. Super.</u> 404, 408 (App. Div. 2000) (declining to apply <u>N.J.S.A.</u> 59:5-2(b)(2) to an officer "attempt[ing] to close the gap and stop" a speeding but non-fleeing motorist).

Our research has not disclosed any cases in New Jersey directly on point with the facts presented here. We do, however, draw guidance from cases decided under Illinois tort claims legislation similar to the TCA. <u>Marley v. Palmyra</u>, 193 <u>N.J. Super.</u> 271, 288 (Law Div. 1983). The analogous section of the Illinois Local Governmental and Governmental Employees Tort Immunity Act provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 <u>Ill. Comp. Stat.</u> 10/2-202 (2014).

The Illinois Supreme Court considered a substantially similar version of this statute in <u>Aikens v. Morris</u>, 145 <u>Ill.</u> 2d 273, 583 <u>N.E.</u>2d 487 (1991). In <u>Aikens</u>, plaintiff sought to recover damages sustained when her automobile was struck by an Evanston police squad car. <u>Id.</u> at 275-76, 583 <u>N.E.</u>2d at 488-89. At the time, the officer was transporting a prisoner from the Village of Skokie lockup facility to the Evanston police

department's lockup facility. Ibid. The prisoner had previously been arrested, handcuffed, and placed in the back seat of the police car. Ibid. According to the officer's testimony, he was in "no hurry." Ibid.

Like the present case, defendants argued that the officer was "executing" or "enforcing" a law, citing Illinois statutes empowering public officials to move or transfer prisoners. Id. at 277, 583 N.E.2d at 489. The court disagreed, reasoning that the officer's "negligent conduct was not shaped or affected in any manner by the nature of duties in either enforcing or executing law." Id. at 286, 583 N.E.2d at 494. In declining to apply the statutory immunity, the court cited with approval Anderson v. Chicago, 29 Ill. App. 3d 971, 331 N.E.2d 243 (1975), a case involving "quite similar" circumstances:

> In Anderson, the appellate court viewed a record which showed that a police officer was transporting, at the time of the accident, two juveniles picked up from the scene of a disturbance, with another police vehicle following and escorting the complainant. The Anderson court determined that the evidence supported the trial court's findings that the officer was not enforcing or executing any laws, even though he was on duty and in the course of his employment. We are similarly compelled.
>
> [Aikens, supra, 145 Ill. 2d at 286, 583 N.E.2d at 494.]

Taken together, we regard these cases as persuasive authority that Officer Caicedo was not acting in the "execution or enforcement of any law" so as to afford him immunity under N.J.S.A. 59:3-3 while transporting the prisoner to the police precinct when the collision occurred.

Our "primary task" in interpreting statutory language is "to effectuate the legislative intent in light of the language used and the objects sought to be achieved." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 554 (2009) (citation and internal quotation marks omitted). Read literally, N.J.S.A. 59:3-3 could be interpreted to immunize all police activities, since "virtually every police function or duty is pursuant to some legal authorization in the broadest sense." Aikens, supra, 145 Ill. 2d at 285, 583 N.E.2d at 493.

We do not believe our Legislature intended N.J.S.A. 59:3-3 to be construed so broadly. Rather, the determination of whether a police officer is engaged "in the execution or enforcement of any law" so as to entitle that officer to good-faith immunity under the statute must be made on a case-by-case basis. Were the circumstances such that Officer Caicedo was responding, for example, to a crime scene, to an accident call with unknown injuries, or to some other situation requiring his immediate attention, we have little doubt that the result we

14

reach would be different. Immunity would also likely attach were Officer Caicedo transporting the prisoner for urgent medical attention, or if the prisoner was unruly or otherwise constituted a dangerous presence in the police vehicle, or if the officer was in a dangerous area or needed to hasten his departure from a hostile crowd. However, the record here is completely devoid of any such emergent circumstances.

We concede that Officer Caicedo's transport of a suspected drug buyer charged with wandering presents a close case. The officer was certainly "carrying out" the law when he first arrested the suspect. However, the policy concern underlying good-faith immunity, that police will be "reluctant to enforce the law vigorously for fear of liability" in its absence, is simply less compelling during the ensuing transport function. Tice, supra, 133 N.J. at 351. On this record, we see no reason why Officer Caicedo, while transporting the prisoner, should not be held to the same standard of care as an ordinary citizen operating his or her own motor vehicle on the roadways of this State. Accordingly, we discern no policy basis to cloak defendants with immunity from liability for the injuries sustained by plaintiff during Officer Caicedo's travel to police headquarters.

B.

We next turn to defendants' arguments regarding new trial and remittitur. We begin by stating certain general principles that guide our analysis. We will not reverse a trial court's decision to deny a motion for a new trial "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. That inquiry requires employing a standard of review substantially similar to that used at the trial level, "except that the appellate court must afford 'due deference' to the trial court's '"feel of the case,"' with regard to the assessment of intangibles, such as witness credibility." Jastram v. Kruse, 197 N.J. 216, 230 (2008) (quoting Feldman v. Lederle Labs., 97 N.J. 429, 463 (1984)). See also Carrino v. Novotny, 78 N.J. 355, 360 (1979); Baxter v. Fairmont Food Co., 74 N.J. 588, 597-98 (1977); Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969).

Because juries have broad latitude to determine damages, "the standard for granting a new trial . . . is necessarily high." Johnson v. Scaccetti, 192 N.J. 256, 281 (2007). "A trial court should not order a new trial or remit a jury's damages award unless it is so clearly disproportionate to the injury and its sequela . . . that it may be said to shock the judicial conscience." Ibid. A court "must be 'clearly and

16

convincingly' persuaded that it would be manifestly unjust to sustain the award."  Ibid. (quoting R. 4:49-1(a)).

In determining whether the denial of remittitur or a new trial was proper, this court is bound by the same standards as a trial court.  Jastram, supra, 197 N.J. at 228-231, 235; Baxter, supra, 74 N.J. at 598; McRae v. St. Michael's Med. Ctr., 349 N.J. Super. 583, 597 (App. Div. 2002).  Unless a jury's award of damages is so disproportionate to the injury and resulting disability, the trial judge should not disturb the award. Jastram, supra, 197 N.J. at 230; Baxter, supra, 74 N.J. at 595. Thus, to qualify for remittitur or a new trial, as we have noted, "the jury's award must shock the judicial conscience." McRae, supra, 349 N.J. Super. at 597 (citing Baxter, supra, 74 N.J. at 596); see Ming Yu He v. Miller, 207 N.J. 230, 252 (2011).

Here, the trial judge's ruling is clearly supported by the record, and does not amount to an abuse of discretion.  The jury verdict in this case did not constitute a miscarriage of justice, nor did the jury's award of damages "shock the judicial conscience."  McRae, supra, 349 N.J. Super. at 597.  "[T]he evidence in support of the jury verdict [was] not insufficient[,]" and the trial judge's decision to deny the motion for a new trial, or in the alternative, a remittitur,

should not be disturbed.  Crego v. Carp, 295 N.J. Super. 565, 572 (App. Div. 1996), certif. denied, 149 N.J. 34 (1997); Amaru v. Stratton, 209 N.J. Super. 1, 7 (App. Div. 1985).

We note that the accounts of the parties and their respective witnesses as to how the accident occurred were conflicting, and left the jury with the task of resolving their credibility.  In challenging the verdict as against the weight of the evidence, defendants argue that the limited observations testified to by plaintiff and his two teenage witnesses are insufficient to establish defendants' liability.  However, Officer Caicedo testified that he was travelling above the speed limit.  Despite his claim that he observed plaintiff swerving his bicycle back and forth over both northbound lanes, Officer Caicedo conceded that he neither slowed nor stopped his police vehicle.  Thus, even if the jury disregarded the testimony of plaintiff and his witnesses, it could have premised its verdict of liability on Officer Caicedo's testimony alone.

With respect to the amount of the jury verdict, plaintiff presented evidence that he was treated for his injuries by Sanjeev Sabharwal, M.D., a pediatric orthopedic surgeon specializing in leg-length discrepancy.  Plaintiff was hospitalized for four days, and remained on bed rest for five months, during which he required assistance with all his bodily

functions. He suffers from a 2.8-centimeter (1.1-inch) leg-length discrepancy, resulting in a permanent limp. Dr. Sabharwal considered procedures to address this discrepancy, but concluded they were too risky. Plaintiff also has permanent scars and persistent stiffness, and no longer engages in the recreational activities he used to enjoy. In Dr. Sabharwal's opinion, plaintiff is now "predisposed to some higher prevalence of low back pain, and possibly some premature arthritis of the lower extremities." At trial, defendants presented no expert testimony contradicting Dr. Sabharwal's findings.

Defendants maintain, however, that the verdict is excessive when compared with damage awards in certain other cases. Defendants cite examples of lesser verdicts, ranging from $90,000 to $1,200,000, based on similar injuries but "much stronger proofs" on liability and future employability. Plaintiff claims that the cases cited by defendants are inapposite, and cites verdicts from other cases with injuries similar to those sustained by plaintiff that range between $1,700,000 and $11,202,000.

A trial court may consider comparable verdicts in determining whether a jury's award is so "wide of the mark" as to shock the judicial conscience. He, supra, 207 N.J. at 258. We are unpersuaded that the verdicts cited by defendants are

sufficient to override the trial court's considered judgment that the award in this case was not "so wide of the mark" as to call for judicial intervention. <u>Ibid.</u> The judge's determination was based on the evidence presented at trial, the judge's "feel of the case," and her judicial experience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION