**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1299-24

THOMAS A. FREDELLA
and KELLY A. KEARNY,[1]

      Plaintiffs-Appellants,

v.

TOWNSHIP OF TOMS RIVER,

      Defendant-Respondent,

and

STATE OF NEW JERSEY
DEPARTMENT OF
TRANSPORTATION and STATE
OF NEW JERSEY DEPARTMENT
OF THE TREASURY-FLEET
MANAGEMENT,

      Defendants.

_____

Argued January 27, 2026 – Decided February 12, 2026

Before Judges Firko, Perez Friscia, and Vinci.

---

[1] Regrettably, Kelly A. Kearny passed away during the pendency of this appeal.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-3198-17.

Phillip C. Wiskow argued the cause for appellants (Gelman Gelman Wiskow & McCarthy, LLC, attorneys; Phillip C. Wiskow, on the briefs).

Thomas E. Monahan argued the cause for respondent (Dasti, McGuckin, McNichols, Connors, Anthony & Buckley, PC, attorneys; Thomas E. Monahan, of counsel; Patrick F. Varga, on the brief).

PER CURIAM

Plaintiffs Thomas A. Fredella and Kelly A. Kearny, now deceased, appeal from the January 16, 2025 Law Division order denying their request for a new trial and the December 20, 2024 order finding defendant the Township of Toms River's (Township) expert's testimony was admissible at trial. Having reviewed the record, parties' arguments, and applicable law, we reverse and remand for a new trial.

I.

This matter returns to us after our remand for the trial court to conduct an N.J.R.E. 104 hearing to address whether the Township's expert testimony was appropriately admitted during the parties' automobile negligence jury trial. Fredella v. Township of Toms River, No. A-3196-21 (App. Div. Feb. 22, 2024)

2

A-1299-24

(slip op. at 1-31). We also directed the court to provide "a more detailed and complete factor-by-factor <u>Daubert</u>[2] analysis." <u>Id.</u> at 13-24.

We incorporate the facts and procedural history as set forth in our prior opinion and summarize the facts relevant to this appeal. <u>Id.</u> at 2-13. In November 2017, Fredella and his former wife, Kearny, filed an automobile negligence complaint against the State of New Jersey Department of Transportation (DOT) and the State of New Jersey Department of the Treasury-Fleet Management (NJ Treasury). Plaintiffs thereafter amended their complaint to name the Township as a co-defendant. Prior to trial, the DOT and NJ Treasury settled. The court presided over a ten-day jury trial between April and May 2022.

During the trial, it was undisputed that a motorist notified the Township on November 5, 2016, at approximately 7:00 p.m., that she had struck a deer on NJ Route 37 West. A Toms River Police Department (TRPD) officer responded to the scene. The officer testified he did not recall if he removed the deer carcass from the roadway. He indicated that when he observed a movable hazard in the roadway, he would generally move it "to a safe distance off the roadway."

---

[2] <u>Daubert v. Merrell Down Pharms., Inc.</u>, 509 U.S. 579 (1993).

A-1299-24

At about 8:30 p.m., another motorist called TRPD to report the deer carcass was in the middle of the roadway. As Route 37 is a State highway, TRPD contacted the DOT to handle removing the deer carcass. The DOT arrived at the scene with two trucks at around 8:45 p.m. The first vehicle pulled to the side of the roadway in front of the deer's location. The second vehicle, a safety truck featuring a large, blinking 4' x 8' "yellow arrow board," stopped in the right lane before the deer carcass.

A responding DOT worker, James Nunn, testified he observed the deer carcass and estimated that it weighed about 100 pounds. He recalled there were deer pieces "scattered throughout . . . all three lanes" of the highway, with the deer's torso in the middle lane. Nunn explained the safety vehicle was pulled behind the deer with its arrow board illuminated at the scene, but no warning signs, cones, or flares were used.

Another DOT worker, Dwayne Livezey, testified that he drove the safety vehicle and stopped in the travel portion of the roadway. He activated the safety vehicle's "flashing yellow" taillights, "strobe lights," and "left arrow" on the "caution bar . . . arrow board." When Livezey went behind the vehicle to retrieve equipment, he saw headlights approaching and "ran" out of the way. He observed Fredella's vehicle crash into the back of the safety vehicle.

A-1299-24

Fredella testified he was traveling for food and to visit a friend when the automobile accident occurred. He had traveled off a highway ramp onto Route 37, driving at a speed of about fifty miles per hour, when he crashed into the back of the DOT safety vehicle. He did not believe the safety vehicle's arrow board was illuminated. He was awake and in pain after the accident. When a responding Emergency Medical Technician (EMT) had difficulty injecting medicine, Fredella explained he used heroin earlier in the "late morning." He sustained severe injuries to his right leg, requiring multiple surgeries.

At trial, the Township's expert, Lawrence Guzzardi, M.D., opined on the opiate effects that Fredella's heroin use had on his vision before the accident. The Township had served plaintiffs with Dr. Guzzardi's medical expert reports in discovery.

Dr. Guzzardi's first report opined that Fredella "was under the influence of an opiate at the time of his accident" because he had "pinpoint pupils," which demonstrated there were "opiates in his system." Regarding whether Fredella was under the influence, Dr. Guzzardi explained the foundation for his opinion was that Fredella's "physical examination revealed . . . [two-millimeter] pupils ('pinpoint pupils')" and Fredella admitted using "two bags of heroin 'early in the afternoon.'"

A-1299-24

Dr. Guzzardi's second supplemental report opined that a "clinical evaluation is at least equally important to the evaluation of patients under the influence of opiates" and he could "evaluate . . . Fredella's level of impairment to a reasonable degree of medical certainty, based upon the medical records currently available." The report elaborated that the factual foundation for his opinion was Fredella's admission to using "two bags of heroin" "within six to ten hours" before the accident and pinpoint pupils. He opined Fredella had a "diminution of peripheral vision and impaired vision in darkness or low light." Dr. Guzzardi opined that the "effects of heroin can be determined by the known half-life of morphine[,] . . . documentation of medical providers[,] . . . known effects of diminished pupillary response[,] and field defects when pupils are constricted by drugs." The report did not delineate the "half-life" of heroin against Fredella's alleged timeframe for using it, nor was there a specific assessment of the diminution alleged. Dr. Guzzardi referenced "documentation of medical providers" to support his conclusion but did not elaborate. Within a reasonable degree of medical certainty, Dr. Guzzardi concluded Fredella had "visual impairment," but provided no specific percentage or estimation of the visual diminution.

A-1299-24

Plaintiffs moved on two separate occasions to bar Dr. Guzzardi's testimony. The court denied plaintiffs' motions, finding their objections went to "the weight of Dr. Guzzardi's opinion[,] not its admissibility."

On April 21, 2022, during a pre-trial conference, plaintiffs moved for a Frye/Daubert[3] hearing regarding Dr. Guzzardi's opinion. After argument, the court denied the motion, finding a N.J.R.E. "104 hearing is not needed" because "Dr. Guzzardi demonstrate[d] the requisite knowledge, training, or experience necessary to" opine that "Fredella was under the influence."

At trial, Dr. Guzzardi explained his qualifications as an "emergency physician" and a board-certified toxicologist. He stated a "toxicologist is somebody who stud[ies] toxins" and that "[a] toxin is a chemical that adversely affects an organism." Regarding controlled dangerous substances, Dr. Guzzardi explained his experience and knowledge surrounding the clinical examination of individuals under the influence. He was familiar with the "narcotics that come from the opium plant, heroin[,] . . . morphine[,] and codeine." Dr. Guzzardi also explained the role of Drug Recognition Experts (DRE) and that he had testified before the New Jersey Supreme Court's appointed special master on issues surrounding the validity of the clinical observations of individuals

_____

[3] Frye v. U.S., 293 F. 1013 (D.C. Cir. 1923); Daubert, 509 U.S. at 579.

A-1299-24

using drugs, including field sobriety and relevant neurological testing. He elaborated that clinical and laboratory tests determine "whether an individual is impaired by . . . drugs at the time of his examination." Dr. Guzzardi confirmed he was not an ophthalmologist. He was qualified by consent to testifying as an "expert in the field of heroin detection."

Dr. Guzzardi acknowledged at trial that he could not opine as to Fredella's level of impairment because the "levels of the drug" were unknown without laboratory testing. He recognized his opinion focused on Fredella's use of two bags of heroin earlier on the day of the accident, although the exact time and amount were unknown, and reliance on medical records for determining that Fredella had "pinpoint pupils." Guzzardi did not personally examine Fredella's pupils and solely relied on medical professionals' measurements. He stated that Fredella's "pinpoint pupils . . . were seen by the EMTs, the paramedics, the nurses, and the doctors" but he did not recite which medical statements in the records he factually relied on. Regarding the term "pinpoint pupil," Dr. Guzzardi explained he was using the term for "a tiny pupil."

Regarding the adverse effect of heroin, Dr. Guzzardi conceded he could not determine "[w]hether [Fredella] was affected . . . adversely and [had] slow reflexes[ or] poor judgment." Dr. Guzzardi could not make that "decision . . .

because [he did not] have any blood levels, . . . [did not] have a good clinical examination, and . . . just [could not] tell . . . that." He opined that Fredella had some degree of heroin in his system because the records indicated his "pupils were two millimeters," which Dr. Guzzardi believed were "as small as you can get." He initially testified the "two millimeters" assessment was in the paramedics' record[4] but later stated, "the initial assessment at the hospital . . . [was] two millimeters pupils." He did not address whether the medical professionals who completed the assessments all used the same methodology in determining the size of Fredella's pupils and whether the assessments were estimates or ascertained with a medical device.

After direct examination, plaintiffs' counsel again moved to bar Dr. Guzzardi's testimony, arguing he could not "connect the dots" between pupil size and driving impairment. The court overruled the objection.

On cross-examination, when Fredella's counsel asked Dr. Guzzardi whether he was aware that the American Ophthalmological Society defines normal pupil size "between two millimeters and eight millimeters," Dr. Guzzardi responded he "d[id not] know." Dr. Guzzardi also admitted there was a pupil

---

[4] The EMT records provided are difficult to read. Nonetheless, we recognize the parties stipulated that the EMT's measurement of Fredella's pupils was two millimeters.

A-1299-24

test called "the Rosenbaum guide," but the medical records did not indicate whether the medical professionals used the guide.  Further, he acknowledged the pupil assessments "would be more exact than just estimating" if the Rosenbaum guide was used.  He confirmed his opinion was based on only Fredella's stated use of heroin earlier on the day of the accident and his belief Fredella had "pinpoint pupils."  Dr. Guzzardi acknowledged there were no "other clinical signs" Fredella "was under the influence of opiates."  While acknowledging he was not an ophthalmologist, he opined Fredella had a "diminished ability to see both to the side and to see a dark object."  He conceded, based on the available information, he could not "quantify" the level of diminution, admitting he did not know whether it was "[ten] percent" or any specific percentage.

At the conclusion of the trial, the jury returned a verdict, allocating liability against Fredella at sixty percent, the Township at twenty percent, and the DOT at twenty percent.  On May 18, 2022, the court entered judgment in favor of the Township.

As stated, after Fredella appealed, we remanded for the court to hold a N.J.R.E. 104 hearing to address the admissibility of Dr. Guzzardi's testimony.  We directed the court to conduct "a more fulsome analysis" of plaintiffs'

objections to Dr. Guzzardi's testimony and include a "complete factor-by-factor Daubert analysis." We highlighted Dr. Guzzardi's opinion relied on "records . . . that Fredella had 'pinpoint' pupils" and noted the "EMT records . . . [were] difficult to read." We concluded that while it was undisputed during the trial that heroin can cause pinpoint pupils, "Dr. Guzzardi's opinion went beyond this point, opining about how pinpoint pupils, in turn, impact[ed] [Fredella's] peripheral vision and ability to see at night."

Relevant to our review, it is undisputed Dr. Guzzardi was not an ophthalmologist and had extended his opinion "to how opioids impact one's vision, despite his lack of qualifications." We also noted Dr. Guzzardi did not "quantify to what extent [the pinpoint pupils] impacted Fredella's vision" and we concluded his opinion "may constitute speculation and a net opinion." The trial court was directed to address Dr. Guzzardi's opinions on the "definition of pinpoint pupils, whether [Fredella's] presentation fit this definition, whether the presence of pinpoint pupils was an accurate estimator that he remained under the influence of heroin, and whether [Fredella's] pinpoint pupils impacted his vision." We stated that if "Dr. Guzzardi offered a proper expert opinion[] and . . . the heroin evidence was not unduly prejudicial, the verdict should stand" because "otherwise, a new trial will be necessary."

11

On August 27, 2024, following our remand, the court held a N.J.R.E. 104 hearing. Fredella stipulated Dr. Guzzardi was qualified to testify as a toxicologist. Dr. Guzzardi testified that "pinpoint pupils" "affect[] . . . driving in two ways." First, "peripheral vision . . . is diminished." He explained his knowledge of "how the eye works" was based on his "textbook" and from studying "physiology" during "medical school." Further, Dr. Guzzardi stated he learned "the eye [becomes] larger or smaller, changing the impression that comes to the back of your eye." He added his "experience [was] that [constricted pupils] limit[] [the] ability to see peripherally" and "the amount of light that comes into [the] eye."

Regarding the second pinpoint pupil effect of reduced night vision, he stated it was "common sense" when "[y]ou go out in the bright light[,] . . . your pupils get smaller because you want to diminish the amount of light." Dr. Guzzardi elaborated that "[t]he effect of the opiate on the Edinger-Westphal Nucleus is to make the pupils stay small regardless of the amount of light coming in" and "when you[ a]re driving at night and there[ i]s not a lot of light . . . pupils should normally dilate to get larger to allow more light in."

He stated, "pupil size can go between two millimeters and eight millimeters" and "[i]n normal light . . . [m]aybe three millimeters." He also

acknowledged that he had modified his opinion, regarding the normal pupil size range, "to say . . . three millimeters[ to] seven millimeters, instead of three and a half, based upon [his] improved reading of the literature."

On cross-examination, Fredella's counsel highlighted that the remand was to address Dr. Guzzardi's opinion on pinpoint pupils and asked why no medical textbook or literature was produced supporting the normal pupil size opinion. Dr. Guzzardi acknowledged he did not produce supporting materials but maintained he previously found "peer reviewed articles" and had provided several studies, which he believed supported the opinion that pinpoint pupils affect vision. He admitted "Fredella's normal pupil size" was unknown but believed it was irrelevant to his opinion. Further, Dr. Guzzardi conceded he could not say within a reasonable degree of medical certainty that "heroin likely caused [Fredella] to drive his vehicle unsafe[ly] at the time of the accident."

In seeking to establish the reliability of his opinion, Dr. Guzzardi compared his conclusion that Fredella likely had reduced peripheral and night vision from constricted pupils to "an individual who[ ha]s taken some degree of alcohol, and they[ we]re involved in an accident." He stated Fredella's "propensity to get into this type of accident was markedly increased by his pinpoint pupils" and he "linked the constricted pupils to the unsafe driving." Dr.

13

Guzzardi offered no data or studies supporting his conclusion that constricted pupils result in vision impairment, which can be causally linked to an increased likelihood of an accident.

After the hearing, the court issued an order and written decision, finding the jury's "verdict stands" because Dr. Guzzardi sufficiently addressed pinpoint pupils and the "how and why pinpoint pupils would affect night vision and peripheral vision by explaining the basic structure and mechanism of the eye." Further, the court found Dr. Guzzardi's "conclusion was explained and supported by education and experience and his opinions were not net opinions." It determined it would be "unduly prejudicial to [the Township] to withhold the testimony." This appeal followed.

On appeal, plaintiffs argue the court committed the following errors: (1) concluding Dr. Guzzardi was qualified to offer ophthalmological opinions; (2) finding Dr. Guzzardi's opinions were not "net opinions"; (3) determining Dr. Guzzardi's opinions satisfied the "supplemental evidence" requirement of Gustavson v. Gaynor, 206 N.J. Super. 540 (App. Div. 1985); and (4) finding the probative value of Dr. Guzzardi's testimony was not substantially outweighed by the danger of unfair prejudice.

A-1299-24

We recognize the fundamental principle that jury trials are a bedrock of our justice system and the fact-finding functions of a jury deserve a high degree of judicial deference. See, e.g., Caldwell v. Haynes, 136 N.J. 422, 431-32 (1994). Jury verdicts are "entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Hayes v. Delamotte, 231 N.J. 373, 385-86 (2018) (quoting Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 521 (2011)). "[A] trial judge shall grant a new trial if, 'having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.'" Little v. Kia Motors Am., Inc., 425 N.J. Super. 82, 92 (App. Div. 2012) (quoting R. 4:49-1(a)).

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). Our Supreme Court, in In re Accutane Litig., "reaffirm[ed] that the abuse of discretion standard must be applied by an appellate court assessing whether a

trial court has properly admitted or excluded expert scientific testimony in a civil case." 234 N.J. 340, 348 (2018). The admissibility of expert testimony is governed by N.J.R.E. 702. Generally, "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise." Townsend, 221 N.J. at 53 (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)).

The Supreme Court has recognized that "[t]he net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (alteration in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). "An expert is required to give the 'why and wherefore' of his or her opinion, not just a mere conclusion or speculation." Riley v. Keenan, 406 N.J. Super. 281, 295 (App. Div. 2009) (quoting Koruba v. Am. Honda Motor Co., 396 N.J. Super. 517, 525-26 (App. Div. 2007)). "To support a causal connection between the act complained of and the resulting injury or damage, experts must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the

methodology are scientifically reliable."  Ibid. (quoting Koruba, 396 N.J. Super. at 526).

The Court has "reconcile[d] our standard under N.J.R.E. 702, and relatedly N.J.R.E. 703, with the federal Daubert standard to incorporate its factors for civil cases."  In re Accutane Litig., 234 N.J. at 348.  The Court "distilled" the following Daubert factors that trial courts are generally to apply, but elucidated they are not "exhaustive":

> 1) Whether the scientific theory can be, or at any time has been, tested;
>
> 2) Whether the scientific theory has been subjected to peer review and publication, noting that publication is one form of peer review but is not a "sine qua non";
>
> 3) Whether there is any known or potential rate of error and whether there exist any standards for maintaining or controlling the technique's operation; and
>
> 4) Whether there does exist a general acceptance in the scientific community about the scientific theory.
>
> [Id. at 398.]

The Court instructed that while courts should incorporate the Daubert factors in reviewing an expert's testimony, "[t]he factors dovetail with the overall goals of our evidential standard and . . . provide a helpful—but not necessary or

17

definitive—guide for our courts to consider when performing their gatekeeper role concerning the admission of expert testimony." Id. at 398-99.

Regarding the effect of a controlled dangerous substance, we have recognized that expert testimony is generally required to explain "the significance" of an individual's blood or urine test results that indicate drug or alcohol use. Black v. Seabrook Assocs., 298 N.J. Super. 630, 637 (App. Div. 1997). This is so because generally "[t]he mere fact that a driver had consumed some alcoholic beverages is by itself insufficient to warrant an inference that the driver was intoxicated and that the intoxication was of such a degree as to render him unfit to drive at the time of the accident." Gustavson, 206 N.J. Super. at 545. "The admission of such testimony without supporting evidence is unduly prejudicial in view of its capacity to inflame the jury." Ibid. It is recognized that when supplemental evidence of intoxication is adduced, juries are permitted to infer how the person's judgment or coordination may have been impaired. Black, 298 N.J. Super. at 636.

## III.

Plaintiffs contend the court erroneously concluded, after the N.J.R.E. 104 hearing, that Dr. Guzzardi was qualified to offer ophthalmological opinions regarding Fredella's constricted pupils, normal pupil size ranges, and alleged

18

reduced periphery and night vision. Specifically, they contend Dr. Guzzardi testified outside of his medical specialties of toxicology and emergency room medicine because he lacked the credentials, experience, or necessary skills to render an expert opinion in ophthalmology. They also assert Dr. Guzzardi's opinions were net opinions because he failed to sufficiently provide the requisite foundation for his conclusions. After our review of the record, we agree Dr. Guzzardi's opinion was inadmissible.

We begin by again highlighting that the court was directed on remand to address Dr. Guzzardi's opinion regarding the following: the accuracy of Fredella's pupil size; the accepted medical "definition of a pinpoint pupils"; whether Fredella's "presentation fit [the pupil size] definition"; whether there was "an accurate estimator that [Fredella] remained under the influence of heroin"; and "whether . . . pinpoint pupils impacted his vision." Because the trial record was not developed on these issues, the Township's initial burden was to establish that Dr. Guzzardi was qualified to offer such opinions. During the N.J.R.E. 104 hearing, plaintiffs stipulated that Dr. Guzzardi was qualified to testify as a toxicologist and to opine that heroin use may cause pupil constriction. Plaintiffs, however, continued to object to Dr. Guzzardi's

A-1299-24

qualifications to testify regarding the medically accepted standard for normal pupil size range and the effects of pupil constriction.

We first address the admissibility of Dr. Guzzardi's opinion that Fredella had "pinpoint" pupils before the accident, which was based on the medical records and Fredella's admission to using heroin earlier in the day. Dr. Guzzardi was clearly qualified, based on his training and experience, to opine on why emergency medical professionals clinically observe an individual's pupils and the medically accepted standard of measuring pupils as a physical indicator of being under the influence. Again, in the present case he did not personally measure Fredella's pupils. Dr. Guzzardi's opinion that Fredella had abnormal "pinpoint" pupils relied exclusively on the medical records, which he believed established Fredella's pupils were measured after the accident by an EMT at two millimeters and later at the hospital at three millimeters. The Township had the burden of establishing Dr. Guzzardi's opinion that Fredella had abnormal pinpoint pupils, which was based solely on other non-testifying medical professionals' measurements, was reliable under N.J.R.E. 703.

To satisfy N.J.R.E. 703, Dr. Guzzardi had to establish the "facts or data" of the medical professionals' pupil assessments that he relied on to form the "bases" of his opinion were "of a type reasonably relied upon by experts in the

particular field in forming opinions or inferences." While N.J.R.E. 703 permits an expert to rely on a hearsay statement, "such as a medical report by a non-testifying expert, to . . . appris[e] the jury of the basis for his opinion, it does not allow expert testimony to serve as 'a vehicle for the wholesale [introduction] of otherwise inadmissible evidence.'" Agha v. Feiner, 198 N.J. 50, 63 (2009) (quoting State v. Vandeweaghe, 351 N.J. Super. 467, 480-81 (App. Div. 2002)) (second alteration in original) (internal quotation marks omitted), aff'd, 177 N.J. 229 (2003). The Supreme Court has long recognized that a medical expert is permitted to advise the jury "'of the bases for his or her opinion, including the opinions of other experts,' but has cautioned that that does not 'entitle a litigant to introduce an out-of-court expert's report for its "truth," where it is critical to the primary issue in the case and the adversary objects.'" James v. Ruiz, 440 N.J. Super. 45, 65 (App. Div. 2015) (quoting Agha, 198 N.J. at 67). In this case, medical professionals, not medical doctors, conducted the underlying clinical diagnostic assessments of Fredella's pupils. Nevertheless, Dr. Guzzardi had to demonstrate it was reasonable to rely on the medical professional pupil assessments and examinations.

Experts are permitted to rely on medical opinions in business records under N.J.R.E. 803(c)(6), as a record "made in the regular course of business,"

"subject to [N.J.R.E] 808." Id. at 61. Indeed, under N.J.R.E. 808, an "[e]xpert opinion that is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness[,] unless the court finds that the circumstances involved in rendering the opinion tend to establish its trustworthiness" and the court is charged to consider "the complexity of the subject matter, and the likelihood of accuracy of the opinion." While relatively simple diagnostic tests contained in medical records may typically be relied on by an expert, complex medical tests or tests with questionable accuracy may be precluded. James, 440 N.J. Super. at 62. Only when the "requirements of [N.J.R.E.] 808 are met, and a testifying expert has reasonably relied upon the non-testifying expert's opinions, [may] the testifying expert . . . be permitted to refer to that absent expert's opinions in the course of explaining his or her own opinions in court." Id. at 64. Further, when an expert "does not demonstrate the soundness of a methodology, both in terms of its approach to reasoning and to its use of data, from the perspective of others within the relevant scientific community, the gatekeeper should exclude the proposed expert testimony on the basis that it is unreliable." In re Accutane Litig., 234 N.J. at 400.

We are convinced the Township failed to establish the reliability of Dr. Guzzardi's opinion based primarily on the accuracy of non-testifying medical

professionals' clinical assessments of Fredella's pupils. Critically, Dr. Guzzardi failed to establish the trustworthiness and reasonableness of the underlying medical assessments he relied on in reaching his conclusions. Moreover, he did not establish that such underlying clinical diagnostic records are typically relied on by similar toxicology or emergency room experts in reaching similar opinions on reduced vision from pinpoint pupils. While we recognize a medical expert's reliance on other medical professionals' records regarding the measurement of a patient's pupils may in fact be routine or standard, Dr. Guzzardi had the burden to establish such reliance was accepted in this context and failed to do so. Specifically, Dr. Guzzardi's reports and testimony offered no accepted medical or scientific standard permitting him to blanketly rely on the other medical professionals' measurements of Fredella's pupils in reaching his conclusions.

The concerns surrounding the reasonableness of Dr. Guzzardi's reliance on other medical professionals' measurements of Fredella's pupils are illustrated by his admission that the professionals' clinical pupil assessments may have been estimates. Dr. Guzzardi testified that the Rosenbaum guide is the standard for measuring pupils and acknowledged that using the guide "would be more exact." Yet, he conceded not knowing whether the medical professionals here

used the guide in measuring Fredella's pupils and did not demonstrate the soundness of his reliance on their assessments in reaching his opinion.

A review of the medical records highlights Dr. Guzzardi's failure to establish that his reliance on the medical professionals' measurements of Fredella's pupils was reasonable and within recognized medical standards. As we have already stated, Dr. Guzzardi premised his opinion that Fredella had abnormal pinpoint pupils at the time of the accident on the EMT's recorded two-millimeter pupil measurement and the hospital's subsequent admission measurement of "three millimeters." Relevantly, Dr. Guzzardi unequivocally testified Fredella's pupil size would have increased as more hours passed from the time he used heroin. While Fredella's hospital admission record on the evening of the accident indicated his pupils measured to be three millimeters, a later examination of Fredella's pupils the next day resulted in the recorded measurement of "[two ]millimeters." Dr. Guzzardi neither addressed nor explained this inconsistency in Fredella's pupil measurements decreasing the day following the accident. The measurement disparity further calls into question the legitimacy in this context of relying on non-testifying medical professionals' measurements. While there may be a legitimate explanation, he failed to provide the underpinning reasons demonstrating reliability and whether

24

it was medically accepted practice. Thus, because Dr. Guzzardi failed to establish a sufficient foundation supporting his reliance on the measurements in the medical records, we conclude it was a mistaken abuse of discretion to admit his testimony.

We next address plaintiffs' specific argument that Dr. Guzzardi's opinions on the accepted standards for abnormal pinpoint pupils and average pupil size range were net opinions. We agree Dr. Guzzardi failed to establish a necessary foundation based on accepted medical standards and data for his opinion that two-millimeter pupils are abnormal "pinpoint" pupils, which he ultimately relied on to conclude Fredella's peripheral and night vision were reduced. Further, he offered no accepted medical standards showing that the normal pupil size range was between "three millimeters[ and] seven millimeters."

On remand, Dr. Guzzardi was provided a further opportunity to substantiate the specific medical bases for his opinions on the normal pupil size range and related Fredella's "pinpoint" pupil size, but he failed to produce any relevant supporting medical literature. Dr. Guzzardi acknowledged understanding the remand was to address his opinions related to the medically accepted standards for pinpoint pupils and the normal pupil size range. We note the several medical studies he submitted were not specifically related to his

25

conclusions on pinpoint pupil size and the normal pupil size range. Moreover, Dr. Guzzardi conceded he was unable to quantify that Fredella had any percentage reduction in peripheral and night vision caused from alleged pinpoint pupils.

It is clear "[a]n expert must demonstrate the validity of his or her reasoning." In re Accutane Litig., 234 N.J. at 392. "Expert opinions must be excluded if they are 'based merely on unfounded speculation and unquantified possibilities.'" Weissman v. Li, ___ N.J. Super. ___, ___ (App. Div. 2025) (slip op. at 15) (quoting Townsend, 221 N.J. at 55). For these reasons, we conclude Dr. Guzzardi's opinions regarding Fredella's abnormally sized pupils and the normal pupil size range were net opinions as they were unsupported by reliable data and accepted standards. Therefore, his opinions that Fredella suffered "two adverse effects from the narcotics"—namely "[diminished] ability to see things in dark and . . . peripheral vision"—should have been barred.

For completeness we address plaintiffs' argument that Dr. Guzzardi failed to demonstrate his qualifications to opine on vision diminution caused by constricted pupils. Plaintiffs posit Dr. Guzzardi did "not even have a first-year ophthalmology student's knowledge of the human pupil" and "his personal opinions [we]re not supported by the relevant medical literature" on pupils. Dr.

Guzzardi, a credentialed toxicologist and emergency physician, testified that he was qualified to opine on the effects of constricted pupils because he had studied "physiology" in his "second year [of] medical school" and he had "an article from a basic textbook of physiology that describes how the eye works." Again, the Township had the burden of establishing Dr. Guzzardi's qualifications.

Dr. Guzzardi failed to establish any specific "knowledge, skill, experience, training, or education" in assessing and determining the quantifiable reduction in either peripheral or night vision based on constricted pupils. He offered no specialized training or experience to opine on vision diminution within a reasonable degree of medical certainty. This is evidenced by his inability to quantify to any degree that Fredella's vision was affected. Thus, we agree he failed to demonstrate sufficient qualifications to offer the opinion that Fredella's pinpoint pupils caused diminished peripheral and night vision, which "markedly increased" Fredella's likelihood of getting into an accident.

Finally, the Township's argument that Dr. Guzzardi's testimony is admissible because the Supreme Court in State v. Olenowski[5] determined "that pinpoint pupils are common toxidromes and the use of psychophysicals to determine whether an individual is under the influence of drugs is scientifically

---

[5] State v. Olenowski, 255 N.J. 529 (2023).

reliable and thus admissible"[6] is misplaced. In holding DRE opinions are admissible, the Court in Olenowski reviewed that the DRE completes a "twelve-step protocol to assess whether a person suspected of drugged driving is impaired by a certain category or multiple categories of drugs." 255 N.J. at 552. The Court recognized that "a series of eye examinations" is one of "twelve steps" the DRE completes in the evaluation protocol. Id. at 552-53. Contrary to the Township's contention, preclusion of Dr. Guzzardi's opinion would not be "a reversible departure of the Supreme Court's holding in . . . Olenowski." Notably, in the present case, Dr. Guzzardi was not offered as a DRE. He did not personally conduct a DRE evaluation of Fredella, nor did he comport with the recognized standards deemed reliable in reaching the conclusion that Fredella was under the influence.

For these reasons, we conclude that Dr. Guzzardi's opinion testimony was inadmissible and remand for a new trial. Based on the record presented, defendant may not introduce any evidence at the re-trial regarding Fredella's

---

[6] A toxidrome, or toxic syndrome, is a "symptom" of a substance that "occur[s] commonly and may suggest toxicity caused by particular classes of substances." Geralf F. O'Malley & Rika O'Malley, General Principles of Poisoning, Merck Manual (rev. Apr. 2025), https//www.merckmanuals.com/professional/injuries-poisoning/poisoning/general-principles-of-poisoning.

heroin use hours before the accident. To the extent that we have not addressed the parties' remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed, vacated, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

29

A-1299-24